IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMANDA NORRIS, *et al.*,

    *Plaintiffs*,

    v.                                                                            Civil Action No.  ELH-20-3315

PNC BANK, N.A., *et al.*,

    *Defendants*.

**MEMORANDUM OPINION**

The self-represented plaintiffs, Amanda Norris and Joseph Norris III, are the owners of a house in Windsor Mill, Maryland (the "Property").  They have filed suit against defendants PNC Bank, N.A. ("PNC") and Safeguard Properties Management, LLC ("Safeguard"), alleging breach of contract (Count I); trespass (Count II); and "Invasion of Privacy/Intrusion upon Seclusion" (Count III).  ECF 1-2 (the "Complaint").[1]

PNC "services" plaintiffs' mortgage for their home.  ECF 1-2, ¶ 2.  On or about September 18, 2017, plaintiffs defaulted on the loan.  *Id.* ¶ 4.  As a result, PNC retained Safeguard, a property preservation services company, to implement steps to protect the Property.  *Id*. ¶¶ 6-7, 40. Plaintiffs, who are married, allege that agents of defendants entered their home several times between October and December 2017, unlawfully and without authorization, under the pretext of protecting the Property.  *Id*. ¶ 7.  Further, they allege the theft and destruction of personal property at the hands of defendants, along with other damages.  *See, e.g.*, *id*.[2]

---

[1] Suit was originally filed in the Circuit Court for Baltimore City. In November 2020, PNC, with the consent of Safeguard, removed the case to this Court on the basis of diversity jurisdiction, pursuant to 28 U.S.C. §§ 1332 and 1441.  *See* ECF 1 (Notice of Removal).

[2] The counts are not numbered in the Complaint; I have numbered them based on the order in which they are presented. *See* ECF 1-2.

After Safeguard (ECF 5) and PNC (ECF 13) answered the Complaint, the parties engaged in discovery.  *See* Docket.[3]   Both Safeguard and PNC have moved for summary judgment.[4]  Safeguard's motion (ECF 109) is supported by a memorandum (ECF 109-1) (collectively, the "Safeguard Motion") and several exhibits.  ECF 109-2 to ECF 109-10.  PNC's motion (ECF 110) is also supported by a memorandum (ECF 110-1) (collectively, the "PNC Motion") and several exhibits.  ECF 110-2 to ECF 110-5.

Plaintiffs oppose the summary judgment motions.  ECF 134 (the "Opposition").[5]   The Opposition is supported by voluminous exhibits.  ECF 135; ECF 136; ECF 137; ECF 138; ECF

---

[3] In November 2021, the Court denied plaintiffs' motion of September 27, 2021 (ECF 68), seeking to amend the Complaint.  *See* ECF 94; ECF 95 (Memorandum and Order of November 12, 2021); *see also* ECF 126; ECF 127 (Memorandum and Order of January 19, 2022, denying plaintiffs' motion for reconsideration).

[4] The original deadline to move for summary judgment was October 18, 2021. *See* ECF 53. Safeguard (ECF 63) and PNC (ECF 76) both moved for summary judgment by that date. However, on November 1, 2021, Magistrate Judge Beth Gesner, to whom I had referred discovery disputes, required defendants to supplement or provide certain discovery by November 15, 2021. ECF 84 at 4, 6. Accordingly, I denied defendants' summary judgment motions as premature, and set December 15, 2021, as the new deadline for summary judgment motions. *See* ECF 94; ECF 95. Safeguard and PNC subsequently filed new summary judgment motions, which are virtually identical to their earlier motions. *See* ECF 109; ECF 110.

[5] Plaintiffs submitted an initial version of their Opposition, docketed at ECF 130. It was partially handwritten and illegible, and although it cited to exhibits, no exhibits were included. Approximately one week later, plaintiffs filed a revised version of the Opposition (ECF 134) that was entirely typewritten and included exhibits, accompanied by a motion to substitute ECF 134 for ECF 130 as the Opposition. *See* ECF 133. In the interest of justice, I granted the motion. *See* ECF 142 (Order of February 4, 2022); *see also* ECF 146 (Order of February 8, 2022, denying defendants' motion for reconsideration).

Plaintiffs have filed ECF 130, ECF 134, and the exhibits to ECF 134 under seal. They have also filed motions to seal. *See* ECF 131 (motion to seal ECF 130); ECF 139 (motion to seal ECF 134 and exhibits). I address the issue of sealing, *infra*.

141; ECF 145.[6]  Safeguard has replied (ECF 152, the "Safeguard Reply"), supported by one exhibit.  ECF 152-1.  And, PNC has replied.  ECF 153 (the "PNC Reply").

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the motions in part and deny them in part.

## I.    Preliminary Issues[7]

Before recounting the facts of this case, the Court must resolve a handful of preliminary issues raised by the parties, largely in relation to the evidentiary record.  On summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

In the Opposition, plaintiffs accuse PNC of disregarding their designation of certain discovery material as confidential, and improperly filing its summary judgment motion publicly, rather than under seal.  ECF 134 at 1-3.  Plaintiffs maintain, rather boldly, that in light of "PNC's naked contempt for this whole process," the Court should "not only strike PNC's Motion for Summary Judgment, but rule in [plaintiffs'] favor as well on all counts."  *Id*. at 3.

With this claim, plaintiffs simply rehash arguments as to sealing that they have previously made.  *See* ECF 99.  And, the Court has already considered and rejected these arguments.  *See* ECF 111 (Memorandum of December 16, 2021) at 6-10.  The Court need not repeat its reasoning

---

[6] Plaintiffs' exhibits are docketed at multiple ECF entries. ECF 141 is a physical compact disc. And, ECF 145 is an additional exhibit plaintiffs sought to add several days after they filed the Opposition. *See* ECF 144. The Court approved the request. *See* ECF 146.

[7] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

here.  It is clear that plaintiffs continue to disagree with, or at least misunderstand, the Court's decision.  Nevertheless, this contention provides no basis for any sanction against PNC.

In its Reply, Safeguard identifies certain exhibits submitted by plaintiffs in support of the Opposition as not provided in discovery.  *See* ECF 152 at 5, 18.  These include, for example, an Affidavit from a therapist seen by plaintiffs, dated February 2, 2022, attesting to plaintiffs' mental health conditions following the events at issue.  *See* ECF 137-16 at 9-10.  Safeguard argues that because these materials were not provided in discovery, they should be stricken.  ECF 152 at 5.

However, Safeguard mounts only a cursory argument that striking these materials is appropriate, but it does not cite to any authority to do so, whether under Fed. R. Civ. P. 37 or otherwise.  Moreover, Safeguard does not identify any discovery requests it made for which these materials would have been responsive.  *See, e.g.*, *Alexander v. Boeing Co.*, No. C13-1369 RAJ, 2014 WL 3900574, at *4 n.4 (W.D. Wash. Aug. 11, 2014) ("Plaintiff also seeks to exclude [certain exhibits] because they were not produced in discovery.  However, plaintiff has not demonstrated that she requested these types of documents during discovery, and defendant failed to produce them. Accordingly, exclusion of these documents as a discovery sanction for failure to produce the documents is not an available remedy.").

The record in this case is voluminous.  And, the Court cannot make the parties' arguments for them.  Accordingly, I will deny Safeguard's request to strike these documents.

With its motion, PNC included a Declaration by Sarah Greggerson, a PNC "Mortgage Officer," providing certain information as to PNC's mortgage practices and plaintiffs' situation. *See* ECF 110-4 (Greggerson Decl.).  Plaintiffs object to this Declaration and seek to strike it on the ground that "PNC did not disclose [Greggerson's] name during discovery."  ECF 134 at 5. They add: "Despite Plaintiffs [sic] repeated requests, PNC refused to reveal any one's [sic] name

but Mr. Daniel W. Morris." ECF 134 at 5. For support, plaintiffs cite to a single interrogatory by plaintiffs, and the answer by PNC. *See* ECF 98 at 4. But, this interrogatory, for which PNC provided the name of Mr. Morris, merely seeks the name of persons who assisted in answering plaintiffs' interrogatories. ECF 98 at 4. It is unclear to the Court why this interrogatory and answer justify striking Ms. Greggerson's Declaration. Plaintiffs have not provided any evidence that Ms. Greggerson assisted in responding to plaintiffs' interrogatories, or that her Declaration is related to the interrogatories. I also note that in Judge Gesner's discovery ruling, she found PNC's response to this interrogatory to be adequate. *See* ECF 84 at 5. Therefore, the Court will deny plaintiffs' objection.

Safeguard also asks the Court to strike a correction made by Mr. Norris on his deposition errata sheet. *See* ECF 109 at 4 n.1. Specifically, Mr. Norris attempted to correct the following exchange at his deposition (ECF 136-1 at 38 (Tr. at 32)):[8]

> Q.   . . . And during this time period in which you were living at the Chase property, I understand your wife and your son would regularly stay with you there?
>
> A.   Yes.

In his errata sheet, Mr. Norris indicated that "Yes" should be changed to "No for wife," asserting that he "misunderstood [the] question." ECF 109-9 at 4. In other words, during the deposition of Mr. Norris, he testified that his wife stayed regularly at a second property owned by

---

[8] Deposition transcript excerpts for the depositions of Mr. and Ms. Norris appear as multiple exhibits in the summary judgment briefing. *See* ECF 109-2 (Amanda Norris Depo. Tr.); ECF 109-3 (Joseph Norris Depo. Tr.); ECF 110-2 (Joseph Norris Depo. Tr.); ECF 110-3 (Amanda Norris Depo. Tr.); ECF 136-1 at 5-35 (Amanda Norris Depo. Tr.); *id*. at 36-41 (Joseph Norris Depo. Tr.). ECF 152-1 (Joseph Norris Depo. Tr.); ECF 152-2 (Amanda Norris Depo. Tr.). However, the "Tr." citations are consistent across exhibits, for each deponent.

plaintiffs, but he sought with his correction to claim that she did not do so.  As will be discussed, *infra*, in the context of the parties' dispute, this is a substantive change.

"Pursuant to Fed. R. Civ. P. 30(e)(1), a party may make timely 'changes to deposition testimony in form or substance if the changes are . . . accompanied by the reasons for making them.'"  *Brittney Gobble Photography, LLC v. Sinclair Broadcast Group, Inc.*, SAG-18-3403, 2020 WL 761174, at *4 (D. Md. Feb. 14, 2020) ("*Brittney Gobble*") (internal citations omitted). Some courts have found that this permits any substantive change, provided it is timely.  *Id.*  In this District, however, the weight of authority appears to the contrary.  *Id.*; *see also, e.g.*, *Linderborn v. Armadillo Ventures, LLC*, CCB-19-2532, 2021 WL 322179, at *3 (D. Md. Feb. 1, 2021); *Smith v. Integral Consulting Servs., Inc.*, DKC-14-3094, 2016 WL 4492708, at *4 (D. Md. Aug. 26, 2016); *Green v. Wing Enterprises, Inc.*, RDB-14-1913, 2015 WL 506194, at *2 (D. Md. Feb. 5, 2015); *Wyeth v. Lupin Ltd.*, 252 F.R.D. 295, 295-97 (D. Md. 2008).

"On a motion to strike errata, the Court not only considers the type of correction but also 'the adequacy of the reason provided and the prejudice of striking the correction.'"  *Brittney Gobble*, 2020 WL 761174, at *5 (quoting *Green*, 2015 WL 506194, at *2).  Moreover, "[i]n 'recent decisions . . . this court [has] interpret[ed] the rule as foreclosing changes that materially alter the testimony or contradict the testimony.'"  *Brittney Gobble*, 2020 WL 761174, at *4 (quoting *Smith*, 2016 WL 4492708, at *4) (alterations in *Brittney Gobble*).  "Thus, 'where the proposed changes do not correct misstatements or clarify existing answers but instead materially change the answers or fully supplant them, such changes will be stricken and the deponent will be barred from utilizing the revised testimony at trial.'"  *Brittney Gobble*, 2020 WL 761174, at *4 (quoting *Green*, 2015 WL 506194, at *2); *see also Wyeth*, 252 F.R.D. at *297 (disallowing corrections that "[did] not

6

clarify but materially change[d] the answers," and "represent[ed] lawyerly fixing of potentially problematic testimony").

I agree with Safeguard that Mr. Norris's proposed correction falls on the impermissible side. Mr. Norris seeks to alter substantively the testimony he provided, so as to assert the opposite of what he said. And, this change is considerably more favorable to Mr. Norris than his original answer. Mr. Norris's cursory explanation—that he "misunderstood" the question—is not persuasive, given the question's straightforward nature.

Similarly, in the Opposition, plaintiffs characterize counsel as attempting to "trick" Mr. Norris during the deposition. ECF 134 at 15. But, it is difficult to see how that was so. Moreover, in terms of prejudice from striking the correction, plaintiffs have argued, through other evidence, the position that Mr. Norris seeks to take with his correction. *See, e.g.*, *id*. Therefore, I will grant Safeguard's request to strike this correction, and consider only Mr. Norris' original deposition testimony.[9]

With the Opposition, plaintiffs have included a copy of an "Assurance of Discontinuance" between the Maryland Attorney General's Office and Safeguard (ECF 135-2), and a "Complaint for Injunctive and Other Relief" filed by the Illinois Attorney General's Office against Safeguard. ECF 135-3. Both documents allege, *inter alia*, that Safeguard has a pattern of misconduct similar to that alleged by plaintiffs. At multiple points in the Opposition, plaintiffs cite to these documents

---

[9] The parties also dispute if Mr. Norris's correction was timely. *See* ECF 109 at 2 n.1; ECF 134 at 15-16. There is no need to resolve this issue, as I have found the correction to be otherwise improper.

Safeguard asserts that "many" of Mr. Norris's corrections were improper material changes, but this is the only one they identify specifically. Therefore, it is the only one I will evaluate.

as, in essence, evidence of Safeguard's wrongdoing or culpability in this case, or in an attempt to create a genuine dispute of material fact.  *See, e.g.*, ECF 134 at 8, 9, 16, 30.

But, neither document establishes any of these allegations against Safeguard: the Illinois document is just a complaint, and the Maryland document, although it resolved the Attorney General's claims against Safeguard, explicitly specifies that it is not an admission or concession of facts or liability by Safeguard.  *See* ECF 135-2, ¶ 17.  And, more fundamentally, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Therefore, I will not consider these documents to establish any wrongdoing, culpability, or specific bad acts on the part of defendants.

Finally, with their Opposition, plaintiffs submitted more than one hundred of their own photographs, intended to demonstrate their asserted damages.  *See* ECF 138.  In a footnote, Safeguard makes a cursory argument that "many" of these photographs "are not legible and should be struck."  ECF 152 at 2 n.2.  It cites Local Rule 102.2(c), which provides: "No document shall be accepted for filing unless it is legible."  To the extent that the photographs are unclear, this will affect the Court's consideration of them when it evaluates the factual record for summary judgment.  However, I am not persuaded that poor quality is equivalent to legibility, and do not view the photographs' poor quality as a basis to strike them, particularly given that Safeguard has not cited to specific photographs.[10]

---

[10] The Court notes that on the CM/ECF version of ECF 138, plaintiffs' photographs are black and white, and of extremely poor quality. In the paper courtesy copy provided by plaintiffs to Chambers, the photographs are in color, and of somewhat better quality. Thus, some of the poor quality may be attributable to the scanning of ECF 138. The day ECF 138 was docketed, defense counsel requested that the Clerk's Office email the submission to them, a request that the Court granted. However, the Opposition also includes a certificate of service indicating that it was mailed by plaintiffs to defense counsel. *See* ECF 134 at 50.

## II.      Factual Background[11]

### A. Events Leading Up to the Entries

Plaintiffs are the owners of a house located on Inwood Road in Windsor Mill . ECF 1-2, ¶ 1; ECF 110-4 (Greggerson Decl.), ¶ 3.   In 2003, plaintiffs obtained a mortgage loan (the "Mortgage") from "National City Mortgage Co dba Accubanc Mortgage."  ECF 1-2 at 25-26 (the "Note"); ECF 110-4, ¶ 3.[12]  The Mortgage is secured by a Deed of Trust encumbering the Property. ECF 1-2 at 27-38 (the "Deed of Trust" or "Deed"); ECF 110-4, ¶ 3.  National City Mortgage Co. was a wholly owned subsidiary of National City Bank, which subsequently merged with and into PNC.  ECF 110-4, ¶ 4.  As a result, PNC succeeded to National City Mortgage Co.'s rights under the Mortgage and Deed, and "currently acts as servicer" for the Mortgage.  *Id*. ¶ 3; *see also id*. ¶ 5.

The Deed was executed by plaintiffs on June 23, 2003.  ECF 1-2 at 27, 36.  Plaintiffs are listed as the "Grantor" or "Borrower;" National City Mortgage Co is listed as the beneficiary; and

---

[11] The factual background is drawn from the materials provided to the Court. Notably, plaintiffs have submitted over six hundred pages of exhibits in support of their Opposition. It is not always easy to determine what facts they assert or dispute, and what exhibits they mean to cite in support of a particular assertion.  In any event, "it is 'not the duty of the district court to scour the record in search of material factual disputes.'" *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019) (internal citation omitted).

Moreover, it was challenging to construct a coherent, accurate narrative of the events that are the subject of the suit based on the summary judgment briefing. In their motions, Safeguard and PNC focus almost exclusively on the visits to the Property in October and December 2017. The Opposition mentions numerous additional events, but includes multiple factual narratives at different points (which do not always align precisely), with citations to exhibits that are difficult to follow, and sometimes no citations at all. In its Reply, Safeguard states that plaintiffs often misunderstand or mischaracterize various Safeguard communications and documents, but it does not go into detail. ECF 152 at 10 n.7.

[12] The Complaint and the exhibits are docketed collectively at ECF 1-2. To avoid confusion, I cite to the Complaint by reference to paragraphs within ECF 1-2. When I cite to exhibits to the Complaint, I cite to pages within ECF 1-2.

Real Title Co., Inc. is listed as the trustee.  ECF 1-2 at 27.  Of pertinence to this case, the Deed

includes the following provision, which states in part, as follows (*id.* at 30) (boldface in original):

> **5. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** . . . Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted.  Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default.  Lender may take reasonable action to protect and preserve such vacant or abandoned Property. . . .

PNC asserts, and plaintiffs do not appear to contest, that the Mortgage is insured by the

Federal Housing Administration ("FHA"), and therefore subject to FHA requirements.  ECF 110-

1 at 2, 4 n.1.[13]   PNC directs the Court's attention to FHA Mortgagee Letter 2016-02, which

"consolidates and updates property preservation and protection (P&P) guidance for properties

securing FHA-insured mortgages."  FEDERAL HOUSING ADMIN., MORTGAGEE LETTER 2016-02 at

1 (Feb. 5, 2016), https://www.hud.gov/sites/documents/16-02ML.PDF.  Mortgagee Letter 2016-

02 provides: "The mortgagee must preserve and protect all vacant properties securing FHA-

insured mortgages in default or in foreclosure."  *Id.* at 2.  And, it enumerates various requirements

for doing so.  *See id.* at 1-19.

Safeguard provides property preservation services.  ECF 110-4, ¶ 7.  Greggerson, the PNC

Mortgage Officer, asserts, *id.* ¶ 6:

> When a loan serviced by PNC goes into default, PNC's business practice is to order one or more inspections of the property. The purpose of such inspections

---

[13] For the proposition that the Mortgage is FHA insured, the PNC Motion cites a paragraph in the Greggerson Declaration that does not actually contain that information. *See* ECF 110-1 at 3; ECF 110-4, ¶ 3. However, the text of the Deed appears to reflect FHA insurance. *See, e.g.*, ECF 1-2 at 28, 31-32.

"As authorized by the National Housing Act, 12 U.S.C. § 1701 et seq., the FHA insures mortgages, meaning that it agrees to protect mortgage lenders against the risk of losses caused by borrower non-payment. As an insurer, FHA sets conditions on the types of mortgages it will insure." *Nehemiah Corp. of America v. Jackson*, 546 F. Supp. 2d 830, 834 (E.D. Cal. 2008).

is to protect the value of the collateral by ensuring that the properties are secure and well-kept. Properties that are vacant or abandoned are especially susceptible to damage through vandalism or inattention. Hence, security instruments such as the Deed of Trust allow mortgagees such as PNC to take action to preserve and protect properties that are found to be vacant or abandoned.

Greggerson avers that PNC does not itself perform such inspections, but hires "independent contractors" such as Safeguard, which themselves may hire "independent contractors" to carry out their inspections and related work. ECF 110-4, ¶ 7. The additional "independent contractors" are sometimes known as "vendors." *See, e.g.*, ECF 136-3 at 32, 44. Greggerson states that PNC expects that, "[u]pon finding that a property is vacant or abandoned," its "inspection vendor will take appropriate action to protect and preserve the property, including by securing and winterizing the property." ECF 110-4, ¶ 8. Further, she asserts that "PNC expects that any person performing an inspection at a residential property securing a PNC mortgage loan will not in any way damage the residential property or remove valuable items from it," and that any such activity "would be outside the scope of the tasks assigned to property inspectors by PNC." *Id.* ¶ 13.

As noted, PNC describes Safeguard as an "independent contractor." ECF 110-1 at 4. However, Safeguard describes itself as "an agent of PNC and a third-party beneficiary of the Deed of Trust." ECF 109-1 at 3.

Safeguard has entered into a "Master Services Agreement" ("MSA") with PNC, governing the services it provides for PNC. *See* ECF 136-2 at 15-45.[14] The MSA provides, for example, for visual exterior and, in some cases, interior inspections of properties. *See id.* at 43. Notably, a provision of the MSA states: "[Safeguard] understands it shall service as an independent

---

[14] Plaintiffs have provided what appears to be the MSA, along with excerpts of a "Statement of Work" attached to the MSA, and an amendment to the Statement of Work. *See* ECF 136-2 at 15-45. The MSA was signed in February 2013. *See id.* at 24. Plaintiffs obtained this document in discovery, and defendants do not appear to dispute that it is the governing contract between PNC and Safeguard.

contractor, and under no circumstances shall it be, or be deemed to be, a partner, agent, servant, distributor, or employee of [PNC] in its performance hereunder." ECF 136-2 at 22.

It is undisputed (*see* ECF 134 at 6) that, following the execution of the Mortgage, plaintiffs began experiencing certain health and financial difficulties. In particular, Ms. Norris testified that her husband suffered from "autoimmune deficiency" and "kidney failure," resulting in a kidney transplant. ECF 109-2 (Amanda Norris Depo. Tr.) at 5 (Tr. at 55). Plaintiffs have also provided a doctor's note, dated March 17, 2014, indicating that Mr. Norris has a medical history of: "Bilateral Knee Amputation, Right Hand Fingers Amputation (due to car Accident), End Stage Renal Disease, Hypertension, and Arthritis." ECF 135-5 at 1. Ms. Norris testified that she last worked in 2002. ECF 109-2 at 3 (Tr. at 43). And, Mr. Norris testified that he last worked in 2013. ECF 109-3 (Joseph Norris Dep. Tr.) at 6 (Tr. at 31).

According to Greggerson, in October 2013, "[a]fter persistent payment difficulties and multiple repayment plans," plaintiffs filed an application to modify the Mortgage due to hardship. ECF 110-4, ¶ 9.[15] PNC ultimately approved a loan modification, which was executed in May 2015, and had the effect of reducing plaintiffs' monthly payments. *Id.*; *see* ECF 1-2 at 39-46 (loan modification). In spite of this modification, plaintiffs subsequently defaulted on the Mortgage, failing to make the monthly payment beginning on July 1, 2017. ECF 110-4, ¶ 10. Plaintiffs do not dispute that they defaulted, and were in default as of the time of the alleged improper entries. ECF 1-2, ¶ 4; ECF 134 at 6. A Notice of Intent to Foreclose the Property was filed on September 18, 2017. *See* ECF 1-2 at 47-50.

---

[15] Plaintiffs appear to dispute that they had multiple repayment plans, without citing to the record. *See* ECF 134 at 6. This issue is not material.

After plaintiffs defaulted on the Mortgage, PNC engaged Safeguard to inspect the Property. ECF 110-4, ¶ 11.   In turn, Safeguard retained Alpha Business Services, LLC ("Alpha"), a Maryland-licensed company providing property preservation services that is owned by Edwin Twesigye.  *Id*. ¶ 11; ECF 109-4 (Edwin Twesigye Aff.), ¶¶ 2-3.  Mr. Twesigye avers that Alpha was hired "to perform property preservation services and secure [the Property], which included winterizing the property, mowing the lawn and landscaping, and changing the locks."  ECF 109-4, ¶ 3.

According to Greggerson, Safeguard did not seek PNC's approval in hiring Alpha, and PNC did not play any role in this hiring.  ECF 110-4, ¶ 12.  Moreover, Greggerson asserts that "PNC did not exercise any control over the actions of Alpha and Mr. Twesigye in performing the inspections."  *Id*.  PNC paid Safeguard for services rendered related to the Property, but did not pay "wages or other compensation directly" to Alpha or Mr. Twesigye.  *Id*.  Plaintiffs have included the contract, also labelled a "Master Services Agreement," between Safeguard and Alpha, which specifies that Alpha is considered an independent contractor of Safeguard.  ECF 136-2 at 3; *see also id*. at 1-13.

### B. Whether Plaintiffs Resided at the Property

The parties dispute the extent to which either plaintiff actually resided at the Property in the fall and winter 2017, when the entries occurred.

Mr. Norris testified that in 2017, plaintiffs were performing renovations on the Property. ECF 109-3 at 4 (Tr. at 29).  This remodeling generated dust, which meant that Mr. Norris could not live there, because of his health conditions.  *Id*.; ECF 110-2 at 6 (Tr. at 44).  Instead, he stayed in a condominium at the Belvedere on East Chase Street in Baltimore City (the "Belvedere Property").  ECF 109-3 at 4-5 (Tr. at 29-30); ECF 110-2 at 6 (Tr. at 44).  Mr. Norris testified that

he could not recall when he began staying at the Belvedere Property, but it was before the entries described in the Complaint.  ECF 109-3 at 5 (Tr. at 30).  And, he returned to the Property in 2020.  *Id*.  He referred to the Belvedere Property as his "primary residence."  *Id*. at 5-6 (Tr. at 30-31).

Mr. Norris testified that Ms. Norris and their son would "regularly stay" with him at the Belvedere Property.  ECF 136-1 at 38 (Tr. at 32).  According to Ms. Norris, their son "probably would have been 15 or 16 years old at the time of the incidents.  *Id*. at 17 (Tr. at 111).  Mr. Norris also testified that the family stayed at the Belvedere Property "occasionally," but that in "the last three or four months of 2017," Ms. Norris "was more" at the Property.  ECF 110-2 at 6 (Tr. at 44).  Mr. Norris claimed that his wife would "stay at the house," meaning the Property, and help with the remodeling, paint, clean, and cut the grass.  ECF 136-1 at 40 (Tr. at 39).  He claimed that their son resided at both locations, but Mr. Norris could not provide more specific details.  ECF 110-2 at 6-7 (Tr. at 44-45).  Mr. Norris also recalled that plaintiffs received their mail at the Property, not at the Belvedere Property, and that Ms. Norris would go to the Property to retrieve the mail.  ECF 136-1 at 40-41 (Tr. at 39, 42-44).

For her part, Ms. Norris testified that plaintiffs owned the Belvedere Property from 1993 to "about 2017, 2018," until it was foreclosed by Bank of America, but she was uncertain as to the dates.  ECF 109-2 at 6 (Tr. at 56).  She acknowledged that Mr. Norris was "staying there for a time" because of the remodeling of the Property and his health.  *Id*. at 4 (Tr. at 54).  She testified that the remodeling ended in approximately 2019, and that it was performed by her neighbor, but that she had helped with painting and cleaning.  *Id*. at 8 (Tr. at 58).  She recalled that she would stay with Mr. Norris and their son at the Belvedere Property.  *Id*. at 9 (Tr. at 59).  Later, she testified that in 2017, she would sometimes stay at the Property and sometimes stay at the Belvedere Property.  *Id*. at 51-52 (Tr. at 183-84).  She also said that she stayed at both properties an "equal

amount of time," but "probably" more often at the Property.  ECF 109-2 at 52 (Tr. at 184).  She also testified that at the time her son was enrolled in school in Baltimore City; the Belvedere Property is also located in Baltimore City, whereas the Property is located in Baltimore County. *Id*. at 52-53 (Tr. at 184-85).

In interrogatories propounded to plaintiffs by Safeguard, plaintiffs were asked to identify all facts and documents supporting their contention that the Property was not vacant at the relevant time.  ECF 109-8 (Pls.' Resps. to Safeguard's First Interrogs., the "Answers") at 6.  Plaintiffs merely cited three provisions of Maryland law regulating foreclosure, including the foreclosure of vacant or abandoned property, without providing any facts.  *Id*. (citing Md. Code (2015 Repl. Vol., 2021 Supp.), §§ 7-105, 7-105.1, and 7-105.18 of the Real Property Article ("R.P.")).  When Ms. Norris was asked about this answer at her deposition, she was unable to expand upon it in any meaningful way.  *See* ECF 136-1 at 10-12 (Tr. at 73-83).

In their Opposition, plaintiffs state: "The record shows that Plaintiffs too kept their possessions at the Property.  The record shows Ms. Norris at the very least too habitually visited the Property with every intention to live in it full time."  ECF 134 at 9.  They also assert that "[d]uring 2017, Mrs. Norris spent multiple days and nights each week at the Property."  *Id*. at 41. However, they do not cite to the record for these assertions.

Safeguard and PNC both point to testimony provided by plaintiffs on this issue in 2016, during bankruptcy proceedings in the District of Maryland.  *See* ECF 152 at 11; ECF 153 at 4 n.3. At a hearing on October 31, 2016, Ms. Norris testified that she was "living in [the Belvedere Property] at the present time."  ECF 140-1 at 8.  And, at a hearing on December 2, 2016, Ms. Norris was questioning Mr. Norris, and the following exchange occurred, ECF 140-2 at 3-4:

> Q:   Okay, let's get to why we are at the condo that we are staying at 1 East Chase Street (sic) [*i.e.*, the Belvedere Property], right?

A:      Yes.

Q:      Can you tell us why we are staying there?

A:      One of the reasons we are staying there is because of the dust and
the mold that is in the -- that is at the 8616 Inwood house [*i.e.*, the Property] and I
can't -- we can't breath [sic] in that house.  It is dangerous for our health.  And we
just can't live in there.

Mr. Norris also testified at the hearing that the Belvedere Property "is very small for the

three people" and that plaintiffs "couldn't bring everything that is at the Inwood house because it

wouldn't fit."  ECF 140-2 at 7.

I discuss, *infra*, additional factual assertions as to whether the Property was vacant, as they

become relevant.

### C. Entries In Fall and Winter of 2017; Subsequent Events

A Safeguard "Work Order Update" of August 17, 2017, indicated that the Property was

inspected on that day and marked as "occupied."  ECF 136-3 at 27-29.  Interior "personals" were

"visible" and a "Door Knock was completed."  *Id.* at 27.  This inspection was performed by John

Najera, about whom no information has been provided.  *Id.*

According to a document cited by plaintiffs, a PNC "agent" visited the Property on

September 1, 2017, apparently to deliver some sort of letter.  ECF 136-3 at 31.  The document was

provided by PNC in discovery.  It appears to be from a contemporaneous electronic log maintained

by PNC concerning events related to the Property.  *See* ECF 136-3 at 31-34, 38, 46, 66-69, 71-81.

However, plaintiffs do not provide any explanation as to the context of these documents.  I shall

refer to the documents as the "PNC log" or the "PNC electronic log."

The PNC agent noted that the lawn was "not maintained," that plastic bags and containers

were strewn about, and that lots of items were visible through a window "piled up in the room."

16

ECF 136-3 at 31.  The Opposition also asserts that on September 14, 2017, following "another visual inspection," Safeguard reported that the Property was vacant, but provides no citation to the record for this claim.  ECF 134 at 41.

Regardless, PNC sent a letter to plaintiffs dated September 15, 2017.  ECF 1-2 at 88.  The letter informed plaintiffs that PNC "recently received a vacancy notification" for the Property.  *Id*. It went on to say that, due to "potential hazards associated with a vacant property" and "investor guidelines," PNC was "required to secure the [P]roperty."  *Id*.  Securing the Property could include, but is not limited to, "changing locks on a secondary door when possible," maintaining the lawn, and winterization of plumbing.  *Id*. at 88.  The letter described these actions as necessary to avoid code citations; prevent weather damage; "and reduce acts of vandalism to protect your interest, as well as PNC Bank's interest in the property."  *Id*.  The letter also included the notation "FF020." *Id*.  PNC's electronic log for the Property includes a "First Time Vacant Report" notation on September 15, 2017, and a note that the "FF020 Letter" had been sent.  ECF 136-3 at 34.

The Complaint alleges that plaintiffs called defendants on or about September 16, 2017, to report that the Property was not vacant.  ECF 1-2, ¶ 9.  PNC's Answer admitted this allegation. ECF 13, ¶ 9.  The Opposition asserts that this call took place on September 16, 2017, citing to these two documents.  ECF 134 at 41-42.  PNC's log reflects that Ms. Norris called on September 15, 2017, "in regards to the notice she received on her door," and "stated they do occupy the home."  ECF 136-3 at 34.  It is unclear what notice Ms. Norris referred to.  Nevertheless, it seems clear Ms. Norris called PNC on or about September 16, 2017.

In addition, PNC sent a second letter to plaintiffs dated September 18, 2017, informing them that the Property "has been reported vacant," and that PNC was required to inform the insurance agency of this "change in occupancy status."  ECF 1-2 at 89.  Ms. Norris testified that

she responded by telephone to the letter on September 18, 2017, "soon after she received it," at some point in September.  ECF 136-1 at 12-13 (Tr. at 84-85).

A Safeguard "Work Order Update" dated September 21, 2017, indicated that the Property was inspected on September 19, 2017.  ECF 136-3 at 26.  The Property was "found to be occupied," "verified by: Direct contact with Male answered door, forcefully asked us to leave, dog barking in yard."  *Id*.  This event is also reflected in PNC's log, entered September 25, 2017.  *Id*. at 33.

The Opposition asserts: "On October 2, 2017, Plaintiffs called Safeguard to report that the Property was occupied."  ECF 134 at 42.  For this assertion, the Opposition cites to an undated letter mailed by "[PNC] c/o Safeguard Properties, LLC" to Mr. Norris.  ECF 1-2 at 90.  The letter advises that Safeguard is conducting a "monthly audit" on behalf of PNC to "verify the occupancy of [the recipient's] property."  *Id*. at 91.  It asks the recipient to call a telephone number to confirm that he is presently residing at the Property.  *Id*.  The letter contains a handwritten notation: "Called on Oct. 2, 2017 Spoke to Deona Reported Propert [sic] occupied + told her it was the 2nd time called and I hope this call takes care of everything."  *Id*.

All of this set the stage for the events that form the core of plaintiffs' claims: the entries into and onto the Property by Mr. Twesigye.  The first round of these entries occurred between October 21, 2017, and October 25, 2017.[16]

---

[16] The exact dates of entry within this period are unclear, but not material. In his Affidavit, Mr. Twesigye refers only to entries "[o]n or about" October 24, 2017 and October 25, 2017. ECF 109-4, ¶¶ 4-7. In addition, pictures of the Property taken by Mr. Twesigye, and provided by Safeguard, are dated October 24, 2017 and October 25, 2017. *See* ECF 109-4 at 4-73.

However, plaintiffs assert an additional entry on October 21, 2017. *See* ECF 134 at 42. And, a Safeguard sign-in sheet its vendors are required to sign when they enter a property indicates that a vendor inspected the Property on October 21, 2017. *See* ECF 1-2 at 62. The parties have not addressed these discrepancies.

In his Affidvait (ECF 109-4), Mr. Twesigye avers that he visited the Property on or about October 24, 2017, after having been advised that the Property was vacant, in order to perform preservation services for which he was retained. *Id.* ¶¶ 3, 4. When Mr. Twesigve arrived at the Property, he conducted an "exterior inspection" and, "based upon [his] training and experience," he "confirmed that the Property was vacant." *Id.* ¶ 4. In particular, a Baltimore County "Code Enforcement & Inspection Citation," dated September 26, 2017, was posted on the door. *Id.* There was also "significant accumulation of debris," dirty tarps, and trash in the yard, as well as significant debris in the deck and the gutters. *Id.* ¶ 4. He did not observe any vehicles or pets at the Property. *Id.*

Mr. Twesigye then entered the interior of the home, where he reconfirmed his assessment that it was vacant. *Id.* ¶ 5. He avers: "Based on my interior inspection of the Property, the Property again did not appear to be occupied." *Id.* In particular, the refrigerator was empty except for a container of baking soda; the kitchen cupboards were empty except for "nonperishable foods and liquor;" "beds were missing mattresses and sheets;" with one exception, the window frames did not have window coverings; there was a circular hole in the ceiling of the Property; the bathroom floor was covered in trash and debris; furnishings were covered by a tarp; and items were piled up in the center of the living room, bedroom, and hallways. *Id.*

According to Mr. Twesigye, once he concluded that the Property was vacant, he performed the requested preservation services, including "mowing the lawn and landscaping, winterizing the Property and changing the locks." *Id.* ¶ 6. Other evidence, including Ms. Norris's testimony, makes clear that although Mr. Twesigye placed a lockbox on the front door, a separate lock on the

---

In the Opposition, plaintiffs also claim that "on October 17, 2017, after another visual exterior inspection, a subcontractor recommended changing the locks and winterizing the Property." ECF 134 at 42. But, they do not cite to anything in support of this assertion.

side door was not changed. *See, e.g.*, ECF 136-1 at 31 (Tr. at 192).  And, he returned the next day, October 25, 2017, to finish his work and take additional pictures.  ECF 109-4, ¶ 7.  Based upon the same observations, and the fact that the lockbox on the door was still "securing the Property," he again confirmed that the Property was vacant.  *Id.*

With its motion, Safeguard submitted approximately 70 photographs of the Property taken by Mr. Twesigye on October 24, 2017 and October 25, 2017.  *See id.* at 4-73.  In general, these photographs are consistent with the specific observations detailed by Mr. Twesigye in his Affidavit.  The photographs show the Baltimore County code citation taped to the door.  *Id.* at 4-5.  A large amount of leaves, weeds, and other debris had accumulated in the yard and on the roof. *Id.* at 6-29.  Notably, a large beehive hung right above the front door.  *Id.* at 22.  The refrigerator was empty, except for one can.  *Id.* at 30.  The kitchen cabinets and cupboards were mostly empty. *Id.* at 31.  In general, possessions, furnishings, and apparent debris were piled or scattered around the house, in a manner that does not suggest the house was occupied.  *Id.* at 32-73.  Some furniture was covered by tarps, and some photographs show cans of paint.  *Id.* at 57-61.

In the Opposition, plaintiffs describe the conditions depicted in the photographs as "staged," and suggest that the posting of the Baltimore County citation may have been as well. ECF 134 at 17.  Plaintiffs also note that simply because the citation was dated September 26, 2017, this does not mean it was posted at that time.  *Id.*  But, they have produced absolutely no evidence to support their bald assertions as to fabrication of evidence.  Nor do they suggest any reason that would lead defendants to fabricate evidence as to the condition of the Property, aside from a cursory argument that Safeguard charges PNC more for securing a vacant property and thus has a financial incentive to describe property as vacant.  *See id.* at 17, 31.

20

Plaintiffs also argue that the state of the Property depicted in Mr. Twesigye's photographs is equally consistent with remodeling, rather than vacancy. ECF 134 at 17.[17]  For example, some of the photographs depict paint cans and tarps on the furniture, which could be consistent with remodeling.  *See, e.g.*, ECF 109-4 at 57-61.  They also point out, ECF 134 at 13, an inconsistency between Mr. Twesigye's Affidavit and his photographs: Mr. Twesigye avers that beds were missing mattresses and sheets (*see* ECF 109-4, ¶ 5), but the beds in the photographs have mattresses, and at least some sheets or blankets.  *Id*. at 32-40, 64, 66-71.  Ms. Norris also testified that the refrigerator was empty because it was broken, and that plaintiffs kept their perishable food "outside in coolers."  ECF 136-3 at 33-34 (Tr. at 200-01).  Finally, they appear to assert that the condition of the yard, including the beehive, was for environmental or ecological reasons.  ECF 134 at 47.  Although plaintiffs submitted exhibits generally discussing the ecological benefits of some of the cited conditions (*see* ECF 135-4), they include no evidence supporting a claim that this was actually their intent at the time.

Plaintiffs became aware of Mr. Twesigye's work when Ms. Norris arrived at the Property on October 26, 2017.  ECF 136-1 at 14 (Tr. at 90).  Ms. Norris testified that this was the first time in six days, since October 20, 2017, that she had visited the Property, and that she had previously been helping Mr. Norris at the Belvedere Property.  *Id*. at 14 (Tr. at 90); ECF 109-2 at 55 (Tr. at 187).  She was unable to recall when, as of October 26, 2017, she had last slept at the Property.  ECF 136-1 at 31 (Tr. at 189-90).  When she found the lockbox on her front door, she called PNC and Safeguard in an attempt to obtain the code and gain entry.  ECF 79-3, calls 1, 12, 13;[18] ECF

---

[17] Plaintiffs do not address how they could afford to remodel the Property, while at the same time being in default on the Mortgage.

[18] ECF 79-3 is a placeholder for recordings of plaintiffs' calls with Safeguard, as well as Safeguard's calls with PNC, which have been submitted by plaintiffs via compact disc.

110-4, ¶ 14; ECF 136-1 at 14 (Tr. at 90-91); ECF 136-3 at 20-22, 32, 44-45, 72.  With PNC's approval, Safeguard provided Ms. Norris with the code but, according to plaintiffs, the code did not work.  ECF 136-3 at 20-22, 32, 44-45, 72.[19]  However, Ms. Norris was able to enter the Property via a side door, whose lock had not been changed by Mr. Twesigye.  ECF 136-1 at 31 (Tr. at 192).

Once inside the home, Ms. Norris discovered the preservation work performed by Mr. Twesigye, and also discovered, she asserts, that some personal property was missing or damaged. *Id*. at 14-15 (Tr. at 91-100).  Thereafter, she called the police, as well as Safeguard and PNC.  *Id*. at 14, 42 (Tr. at 90, 193).  For example, according to PNC's log, she called PNC and reported that she had entered her Property and determined that her son's piggy bank was broken or missing, her personal property was "vandalized," and that she was contacting the police and an attorney.  ECF 136-3 at 32.

Similarly, plaintiffs submitted recordings of several phone calls from Ms. Norris to Safeguard on October 26, 2017.  *See* ECF 79-3, calls 1, 12, 13.  In these calls, Ms. Norris seeks the lockbox code; mentions that she has previously called twice; asserts that some of her belongings have been destroyed or "vandalized," specifically mentioning that some of her jewelry is "gone;" claims that she is living in the Property; and asks what will be done about the individuals who "stole" her possessions.  *Id*., calls 1, 12, 13.  The Opposition states that in these calls, Safeguard "indicated that the Property would thereafter only be subject to exterior visually [sic] inspections." ECF 134 at 42.  But, the recordings of the phone calls do not include such a statement from Safeguard.  *See* ECF 79-3, calls 1, 11, 12, 13.  An email of October 26, 2017, between

---

[19] The materials imply that plaintiffs were ultimately provided with the correct code, but it is unclear when this occurred.

Safeguard employees states that the Mortgage should be flagged as "only No Contact orders." ECF 136-3 at 21.

Officer Sewell from the Baltimore County Police Department responded to the Property on the same day and spoke to Ms. Norris. ECF 109-5 (the police report). According to Officer Sewell's police report, Ms. Norris informed the officer that the Property was currently in the "intent foreclosure process;" that PNC was supposed to give her the lockbox code, but had not; that she could enter through a side door; that "numerous items" were "disturbed (moved, open, broken)" or missing from the Property; and that when she was last at the Property on October 20, 2017, "everything was fine." *Id.* at 3. Officer Sewell spoke with "Verda," a PNC customer service representative. *Id.* Verda advised that the location was in fact foreclosed; that PNC would only change the locks if it was actually foreclosed; that PNC "no longer want[ed]" Norris at the Property, until further notice; and that she could not provide any further information. *Id.*[20]

Norris did not provide the police with a written list of broken or missing items, and she could not recall if she mentioned specific items to him, beyond her son's piggy bank. ECF 136-1 at 16 (Tr. at 105-08). She discussed criminal charges with Officer Sewell, but the officer responded that it was a civil matter, and that his supervisor told him that he could not do anything. *Id.* at 18 (Tr. at 113-16). Officer Sewell concluded, ECF 109-5 at 3: "I advised complainant Norris that her items are considered abandoned property, and this incident is a civil matter she would have to deal with, through PNC Bank. There was no forced entry to the location." Notably, Ms. Norris did not follow up with the police as to the items, nor did she file an insurance claim. ECF 136-1 at 18 (Tr. at 113), 32 (Tr. at 193-94).

---

[20] Some of the information Officer Sewell asserts in the police report that Verda conveyed is incorrect. For example, the Property was not foreclosed.

I discuss in more detail, *infra*, the evidence produced by plaintiffs as to the extent of damage to the Property and its contents, and as to defendants causing this damage. For now, I continue with the timeline of events.

In the Opposition, plaintiffs assert that "a third-party again entered the Property" on October 28, 2017. ECF 134 at 42. The Opposition cites to photographs of the Property provided by Safeguard in discovery, apparently taken by a Safeguard employee or contractor, dated October 28, 2017. ECF 137-1 at 7. One of these photographs shows the Property's front door partially open. *Id*. However, no further information about any incident or entry on October 28, 2017, has been provided. Moreover, this date is not mentioned in Mr. Twesigye's Affidavit or in defendants' briefing. *See* ECF 109-4.

An entry in the PNC log appears to reflect that, on October 30, 2017, a representative from PNC spoke with the mortgagor for the Property (*i.e.*, plaintiffs), and "verified" that the Property had been placed "on hold," and no property preservation work would occur. ECF 136-3 at 32. And, on November 14, 2017, a representative for Safeguard left a voicemail on Ms. Norris's cell phone. *See* ECF 79-3, call 15. In this voicemail, the representative told Ms. Norris that Safeguard's client (*i.e.*, PNC) was "abiding by" Ms. Norris's "request"; that "all work has stopped"; that Safeguard would not be "back at the property"; and that the Property was "reported as occupied." *Id*.

Despite this call, the Opposition asserts that on the same day, November 14, 2017, Safeguard posted a sticker on the Property's garage door "stating that the Property was reported vacant." ECF 134 at 42. For this assertion, plaintiffs cite to a photograph provided by Safeguard. *See* ECF 136-5 at 5. This photograph appears to show some sort of notice on a garage door, and

lists a "Completed Date" for the "Order" of November 14, 2017.  ECF 136-5 at 5.  But, the photograph is not of sufficient quality to determine the content of the notice.

On November 26, 2017, Ms. Norris wrote a letter to PNC, stating: "I am writing to inform PNC Bank that my home is owner occupied, and I do not want to have any further misunderstandings in this matter."  ECF 1-2 at 92.  She noted that she called PNC on September 16, 2017, and October 2, 2017, to verify that the Property was occupied, but that the Property had still be entered afterwards.  *Id*.  She also asserted that, after the call from Safeguard on November 14, 2017, Mr. Norris found a sticker on the garage door on November 20, 2017, informing plaintiffs that the Property had been reported vacant, and that plaintiffs received another letter from PNC on November 16, 2017, "stating the same thing." *Id*.[21]  In the letter, Ms. Norris also claimed that Safeguard "vandalized" the Property; that Safeguard and PNC "rob[bed] and trash[ed]" the Property; and that "valuable belongings were broken and taken." *Id*.[22]

In addition, the letter of November 26, 2017, claims that as Ms. Norris was "about to send" the letter, she "found that Safeguard had entered [the Property] again." *Id*. at 92. Similarly, the Complaint alleges that the Property was "broken into again" on November 26, 2017.  ECF 1-2, ¶ 16.  Plaintiffs' Answers also mention an entry on this date.  ECF 109-8 at 5.  However, no further information has been provided about this alleged incident, and it does not appear to be mentioned in the Opposition.

Mr. Twesigye next entered the Property "on or about" December 1, 2017.  ECF 109-4, ¶ 8.  He continued to perform preservation services and "secure the Property." *Id*.  As part of this work, he again placed a lockbox on the front door.  ECF 137-1 at 10.  Mr. Twesigye avers that

---

[21] This garage door sticker may be the notice plaintiffs assert was posted on November 14, 2017, as discussed above. No separate notice from November 20, 2017, has otherwise been mentioned.  And, the letter of November 16, 2017, has not been provided to the Court.

upon his arrival and entry in the Property, he "once again confirmed that the Property was" vacant. ECF 109-4, ¶ 8.[23]

Plaintiffs discovered this entry on December 5, 2017, when Ms. Norris arrived at the Property for the first time since the entry. *See* ECF 79-3, call 16. Ms. Norris called Safeguard to obtain the access code for the lockbox, and to inquire why the entry had occurred, given the message she had received on November 14, 2017. *Id*. The Safeguard representative provided Ms. Norris with the lockbox code after obtaining approval from PNC. *Id*.

In addition, the Safeguard representative informed Ms. Norris that although the client (*i.e.*, PNC) had stopped work on November 14, 2017, the client had subsequently closed this "hold" and placed a new order for preservation work after plaintiffs had failed to respond to a letter PNC had sent them. *Id*. The Safeguard representative mentioned a date of November 24, 2017, although it is unclear from the call if she meant that PNC had sent the letter on November 24, 2017, or had closed the hold on November 24, 2017, after receiving no response to an earlier letter. *Id*. The latter option aligns with the PNC letter of November 16, 2017, that Ms. Norris mentioned in her letter of November 26, 2017. *See* ECF 1-2 at 92. The Safeguard representative did not give any indication on the call that Ms. Norris's letter of November 26, 2017, had been received or processed. ECF 79-3, call 16.

During the phone call, Ms. Norris asserted that the Property had been "trashed again," and that she was still occupying it. *Id*. The Safeguard representative advised her to contact PNC, and said that Safeguard was "getting approval" to put a new hold in place. *Id*. Internal Safeguard

---

[23] In Mr. Twesigye's Affidavit, the sentence ends abruptly after "the Property was," but it is clear from context that it is supposed to end in "vacant." ECF 109-4, ¶ 8.

emails are consistent with this call. *See* ECF 136-3 at 4, 6-13, 86-87. Plaintiffs did not contact the police after this entry. ECF 136-1 at 18 (Tr. at 115).

On December 18, 2017, Mr. Twesigye returned to the Property to perform preservation services. ECF 110-4, ¶ 9. He avers that upon his arrival and reentry, he again confirmed that the Property was vacant. *Id*. According to Mr. Twesigye, the Property was in the same condition as observed by him on his previous visits on October 24, 2017, October 25, 2017, and December 5, 2017, and "[n]othing had changed." *Id*. Conversely, Ms. Norris testified that she had performed at least some cleanup work following the October entries. *See* ECF 136-1 at 35 (Tr. at 211-12). Plaintiffs do not assert that a lockbox was placed on the door at this visit. *See* ECF 136-3 at 97; ECF 137-1 at 13-14. Plaintiffs have also submitted a Safeguard "Work Order Update" dated December 17, 2017, appearing to indicate that an inspection was completed that day, and the Property was noted as "occupied." ECF 145 at 1. It is unclear when plaintiffs discovered this entry, but again, they did not contact the police. ECF 136-1 at 18 (Tr. at 115).

Ms. Norris received a phone call from a Safeguard representative on December 21, 2017. ECF 79-3, call 18. The representative informed Ms. Norris that PNC was now stopping work on the Property, although she did not explain the confusion of the past month. *Id*. Notably, the Safeguard representative stated: "We apologize that this happened again . . . I apologize for the invasion." *Id*. Internal Safeguard emails on this date reflect that the Property had been marked as "No Contact Inspections," and that Ms. Norris was to call every month to verify she was still at the Property. ECF 136-3 at 2-3.

Throughout this period, plaintiffs had been in the loss mitigation process with PNC in an attempt to avoid foreclosure. *See, e.g.*, ECF 110-4, ¶ 15; ECF 136-3 at 32, 34, 56-61, 66-68. PNC appointed Substitute Trustees for the Property on December 29, 2017. ECF 1-2 at 51-52. The

Substitute Trustees initiated foreclosure proceedings in the Circuit Court for Baltimore County on January 11, 2018. *See Hodge, et al. v. Norris, et al.*, No. 03-C-18-000338 (Balt. Cty. Cir. Ct.). As part of these proceedings, a "Final Loss Mitigation Affidavit" was filed the same day. *See id.* The Affidavit, prepared on January 2, 2018, asserts that PNC did not conduct a loss mitigation analysis, because the Property was not eligible, as it was "vacant." ECF 1-2 at 62.

On January 24, 2018, PNC sent Ms. Norris a letter indicating that on December 11, 2017, it had received her letter of November 26, 2017. ECF 1-2 at 94. PNC stated: "We sincerely apologize for the frustration you have experienced regarding this matter." *Id.* According to the letter, as of January 24, 2018, "Property Preservation" had placed a hold on plaintiffs' account to cease any further action to secure the Property. *Id.* The letter also explained that PNC has no "direct control" over the inspection process, but that plaintiffs' "complaint" had been "escalated" for "further research." *Id.* And, the letter noted that plaintiffs' Mortgage was under review for loss mitigation assistance options, and requested further information from plaintiffs. *Id.*

Ms. Norris filed a motion to stay or dismiss the foreclosure sale, which made, *inter alia*, some similar arguments to the ones they advance in this case. ECF 109-6. It was rejected by the Circuit Court for Baltimore County on April 18, 2018, without written explanation. ECF 110-7. And, on June 11, 2018, after a foreclosure request did not result in an agreement, the circuit court authorized the Substitute Trustees to schedule the foreclosure sale, subject to the right of the borrower to file a motion to stay or dismiss. ECF 136-6.

Subsequently, PNC resolved plaintiffs' default through a loan modification, which was memorialized on October 26, 2018, after which the foreclosure proceeding was dismissed. ECF 110-4, ¶ 15. Mr. Norris moved back into the Property in 2020, after the Belvedere Property was foreclosed by Bank of America. ECF 109-2 at 6 (Tr. at 56); ECF 109-3 at 5 (Tr. at 30); ECF 136-

1 at 33 (Tr. at 200).  Plaintiffs are currently in possession of the Property.  ECF 109-2 at 4 (Tr. at 30); ECF 134 at 12.

### D. Damages and Defendants' Responsibility

In the Complaint, plaintiffs seek $250,000 in compensatory damages and $10 million in punitive damages.  ECF 1-2 at 8.  As mentioned, a significant dispute in this case concerns the extent, if at all, to which the Property was damaged, and the extent to which plaintiffs' possessions were stolen, damaged, or destroyed; if plaintiffs suffered any other damages; and the extent, if at all, to which defendants are responsible for any losses or damages that plaintiffs suffered.

In his Affidavit, Mr. Twesigye asserts explicitly: "At no time did Alpha Business Services or I destroy or take any personal property at the Property."  ECF 109-4, ¶ 10.  Likewise, in her Declaration, Greggerson avers: "PNC has seen no evidence to cast doubt on these assertions by Mr. Twesigye."  ECF 110-4, ¶ 13.  In their briefing, Safeguard and PNC argue that plaintiffs have no evidence that any of their personal property was taken or destroyed, or indeed that they suffered any damages, describing any evidence offered by plaintiffs as self-serving, vague, not consistent, and not credible.  *See* ECF 109-1 at 14-16; ECF 110-1 at 13; ECF 152 at 17-19; ECF 153 at 7-8.

Plaintiffs hotly dispute this contention.  They have consistently claimed that defendants damaged the Property and took, damaged, or destroyed their personal property.  For example, Ms. Norris asserted as much in her communications with the police, Safeguard, and PNC in the fall and winter of 2017.  *See, e.g.*, ECF 1-2 at 92 (letter of November 26, 2017); ECF 79-3, calls 1, 13, 16 (calls with Safeguard); ECF 109-5 at 3 (police report); ECF 136-3 at 32 (PNC log).  Plaintiffs appear to claim that this damage occurred primarily, but not exclusively, during the October entries.  ECF 136-1 at 15 (Tr. at 97-100).  Whether plaintiffs have adduced evidence of their claims is a distinct issue.

In their Answers, plaintiffs provided a list of personal property that they assert was stolen or destroyed, along with dollar values.  ECF 109-8 at 7-8.  These include several signed books; a piggy bank containing $600 in cash; a car originally worth $10,000 and now worth $3,500; a riding lawnmower; a washing machine; stemware and china; items of clothing; a statute by the sculptor Frederic Remington worth $1,200; and other items, totaling approximately $9,600 at the time that they were stolen or destroyed.  *Id*.  As to the piggy bank, plaintiffs assert that it belonged to their son and contained his money, and that it was smashed and the money was stolen.  *Id*. at 9.  Ms. Norris testified that $400 of the cash in the piggy bank came from $100 dollar bills that each of the son's grandparents contributed when he was born.  ECF 136-1 at 16 (Tr. at 108).  Furthermore, they claim that defendants wrote a phrase ("Basement 55 yrds") on a Valentine's Day card from their son.  ECF 109-8 at 9.  Plaintiffs also claim that individuals "riffled through [Ms. Norris's] intimate apparel."  *Id*.

Plaintiffs claim either $3,000 or $3,500 in damages for their car, a 1999 Toyota Avalon. *See id*. at 7; ECF 136 at 10-11.[24]  This value was derived from the Kelly Blue Book.  ECF 136 at 10-11; ECF 136-1 at 19 (Tr. at 119-20).  Ms. Norris testified that electronics were taken out of the vehicle, the seats were damaged, and the glove compartment was accessed.  ECF 136-1 at 19-20 (Tr. at 119-22).  However, Ms. Norris testified that plaintiffs never took the car to be repaired, and she did not know how much that would cost.  *Id*. at 20 (Tr. at 121-22).  And, Mr. Norris testified that the car was inoperable at the time of the entries, and remained inoperable as of the deposition in May 2021.  ECF 109-3 at 1-2 (Tr. at 26-28).

---

[24] Plaintiffs' Interrogatory Answers include a $3,500 figure, but Ms. Norris testified to $3,000 at her deposition. ECF 109-8 at 7; ECF 136 at 10-11.

In addition, plaintiffs asserted in the Answers that the Property had depreciated in value in the amount of $234,000, but did not provide the overall value of the Property.  ECF 109-8 at 8. And, they listed further damage to the Property, including damage to the water heater; front door; plumbing; bathroom floors; and toilets; as well as mold and the removal or replacement of several trees.  *Id*.  These items totaled approximately $7,000, although not all are accompanied by dollar amounts.  *Id*.  They also claim $1,560 in damages from biweekly laundromat visits for three years, because their washing machine was rendered unusable.  *Id*.  Many of these damages are allegedly the result of the repeat winterizing of the Property by defendants.  *See, e.g.*, ECF 134 at 34, 39-40.

Ms. Norris articulated similar but somewhat more expansive claims at her deposition.  She mentioned the card; the piggy bank; broken stemware and glasses; clothes pulled out of drawers; using clothes as rags; a "lopsided" riding lawnmower wheel; mold in the bathroom; an American flag received by one of plaintiffs' fathers for military service that was missing; and a damaged washing machine.  *See* ECF 136-1 at 15, 16, 20, 22-24, 28 (Tr. at 99, 106-07, 122-24, 130-31, 134-37, 161-62).  As to the mold, plaintiffs contend in the Opposition that defendants drained their toilets and that, because of damage from defendants, their toilets did not work.  ECF 134 at 39. According to plaintiffs, this led to water damage on the floors, which created mold.  *Id*.   Ms. Norris also testified that certain trees on the Property "fell apart" or were "uprooted" because of damage from defendants in the course of trimming tree branches.  ECF 136-1 at 22-23 (Tr. at 132-34).  As mentioned, she also asserted that the conditions depicted in the Safeguard photographs were fabricated by the inspectors.  *Id*. at 34-35 (Tr. at 202-11).

With the Opposition, plaintiffs have provided an "Estimate" for tree and yard work by a company, "Arbor Care Tree Experts, Inc.," dated September 22, 2021, and totaling $2,171.  ECF 136 at 1.  Similarly, plaintiffs have included a document from another company, "All American

Window & Siding, Inc.," dated October 2, 2021.  ECF 136 at 18.  This document is not fully legible, but appears to show an estimate for "3 Baths Complete Remodel" at the Property.  *Id.* However, neither of these documents indicates that the proposed work is a response to any conditions created by defendants.  Both are dated approximately four years after the entries, and it is not clear that any work has actually been performed.

At her deposition, Ms. Norris said that plaintiffs found dollar values for missing or damaged items, as well as depreciation, from the Internet, and that they lacked receipts for many of the older items.  ECF 136-1 at 19-22 (Tr. at 117, 124-25, 129-30).  Plaintiffs submitted printouts from websites showing the price of various items that they assert were damaged or stolen by defendants, such as a hot water heater, a riding mower, and a washing machine.  ECF 136 at 6-9, 12-17.  For example, one document is a printout of a page on the Sears website, showing a price of $1,999.99 for a new Husqvarna "Hydrostatic Riding Mower."  *Id.* at 8.  But, these materials do not establish the age or condition of the allegedly damaged or stolen items, either before or after the entries; that defendants caused any damage to the items; or that the replacement items are of the same brand, model, quality, or condition of the damaged items.

In addition, plaintiffs submitted hundreds of photographs of the exterior and interior of the Property, both those provided by Safeguard and some that they took themselves.  *See* ECF 137-1 to ECF 137-15; ECF 138.  This is the largest part of their documentation as to damages, as they claim these photographs establish both damages to their Property, and that defendants caused the damages.  *See, e.g.*, ECF 134 at 18, 42-43.

The Safeguard pictures were taken contemporaneously with Mr. Twesigye's entries in October and December 2017.  *See* ECF 137-1 to ECF 137-15.  Plaintiffs have not been clear as to when they took their photographs; Ms. Norris testified that at least some of them were taken in

late 2017.  ECF 136-1 at 28 (Tr. at 162-63).  Plaintiffs concede that they have no photographs of the Property prior to the entries, to which these photographs could be compared.  *See id*. at 24 (Tr. at 138-39).  Moreover, although the photographs show the condition of the Property after the entries, they do not establish that the defendants are the cause of any of the depicted conditions.

In general, the photographs, whether taken by Safeguard or plaintiffs, show rooms in various states of disarray, with possessions, furniture, and debris scattered about.  In other words, they are similar to the interior photographs taken by Mr. Twesigye and included with the Safeguard Motion.  *See* ECF 109-4 at 30-73.  A few specific photographs are emphasized by plaintiffs, and worth highlighting.

A Safeguard photo of a bedroom closet, dated October 24, 2017, shows the piggy bank that plaintiffs claim was destroyed during so called preservation work.  ECF 137-7 at 1.  In a Safeguard photo of the same closet, dated October 25, 2017, the piggy bank is no longer visible.  *Id*. at 2. Photos taken by plaintiffs depict what appear to be broken pieces of the piggy bank, piled on a table.  ECF 138 at 19-20.  A Safeguard photo of the basement, dated October 24, 2017, shows the Remington sculpture.  ECF 137-10 at 3.  In a Safeguard picture of the basement, dated October 25, 2017, the sculpture is no longer visible in that location.  *Id*. at 2.  In a Safeguard picture, "Basement 55 yds" is written on a Valentine's Day card, and other pictures show similar room and length notations written on other pieces of paper.  ECF 137-6.  Several photos taken by plaintiffs are described as depicting plaintiffs' clothes that were used by defendants as rags.  For example, they were allegedly used to clean up toilet water that was drained as part of the winterizing process. *See, e.g.*, ECF 138 at 35-36, 91-94.

Plaintiffs also assert physical and emotional damages caused by defendants' actions.  In their Interrogatory Answers, plaintiffs claimed "emotional trauma;" "emotional distress;" "pain

and suffering;" and "mental anguish."  ECF 109-8 at 5.  Specifically, Ms. Norris has claimed that since the entries, she cannot sleep, does not feel safe, her eating habits fluctuate, she hyperventilates, and she has developed headaches and rashes.  *Id*. at 9; ECF 136-1 at 24 (Tr. at 140).  The Opposition includes photos of Ms. Norris's rash, apparently taken in 2019.  ECF 136-1 at 6 (Tr. at 25-26); ECF 137-16.  And, Mr. Norris testified that he also suffered from poor sleep and a fluctuating appetite.  ECF 109-3 at 10 (Tr. at 35).

Ms. Norris testified that as of her May 2021 deposition, she had not sought medical treatment, except for her rash.  ECF 136-1 at 24-25 (Tr. at 144-45).  However, she did not see a dermatologist regarding her rash until approximately March or April 2020.  *Id*. at 25-26 (Tr. at 142-45).  And, she testified that although her dermatologist told her that stress generally could be one of the causes of the rash, she did not discuss the incidents that were the subject of the Complaint with the dermatologist.  *Id*. at 26 (Tr. at 146-48).  Plaintiffs have included no medical documentation as to the rash, aside from a document generally listing the causes and treatments of atopic dermatitis.  *See* ECF 137-16 at 11-12.

Ms. Norris testified that her son had not sought any medical treatment because of the incidents described in the Complaint.  ECF 109-2 at 49 (Tr. at 149).  Similarly, Mr. Norris testified that, as of Mr. Norris's deposition in May 2021, he had not received any treatment for his emotional harm, nor had he seen any medical professional for the symptoms he described.  ECF 109-3 at 11 (Tr. at 36).

As noted, apart from Ms. Norris's visit to the dermatologist, both Mr. and Ms. Norris testified that they had not sought medical treatment for their health conditions.  However, in the Opposition, plaintiffs included an Affidavit from Albert Phillips, a "licensed therapist," dated February 2, 2022.  ECF 137-16 at 9-10.  Phillips avers that he has known plaintiffs since December

14, 2020, and has seen them "on numerous occasions," with the "most recent biopsychosocial assessment completed on 12/14/20." ECF 137 at 9.[25]  Phillips opines that plaintiffs currently "meet diagnostic criteria" for several mental disorders, including Post-Traumatic Stress Disorder, Social Anxiety Disorder, and Major Depressive Disorder for Ms. Norris; and Major Depressive Disorder, Social Anxiety Disorder, and Obsessive-Compulsive Disorder for Mr. Norris.  *Id.* at 9-10.  The Affidavit notes that both plaintiffs attribute these conditions to the incidents that are the subject of this suit, although it is not clear whether Phillips adopts this attribution.  *Id.*

Additional facts are discussed, *infra*.

### III.   Legal Standards

### A.  Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc*., 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp*., 890 F.3d 463, 470 (4th Cir. 2018).

---

[25] It is not clear how Mr. Phillips's assertions that he has seen plaintiffs since December 2020 comport with plaintiffs' May 2021 testimony that they had not sought medical treatment, except for Ms. Norris's visit to the dermatologist. And, Mr. Phillips does not explain how he could have first met plaintiffs on December 14, 2020, and seen them numerous times since, but completed the "most recent biopsychosocial assessment" on December 14, 2020.

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see CTB, Inc. v. Hog Slat, Inc*., 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc*., 888 F.3d at 659; *Sharif v. United Airlines, Inc*., 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014). But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, she must support her factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ." But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is

entitled to summary judgment by citing to evidence in the record, or "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24.   And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).   But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).   Rather, "there must be evidence on which the jury could reasonably find for the nonmovant." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; accord *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).   Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Kellen v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Betton*

*v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty*., 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc*., 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc*., 370 F.3d 423, 433 (4th Cir. 2004)). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *see also CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co*., 499 Fed. App'x 285, 294 (4th Cir. 2012). "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997). At the same time, if testimony from a nonmovant is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc*., 700 F. App'x 209, 212 (4th Cir. 2017).

As noted, plaintiffs are self-represented. Therefore, their submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the Court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses

from proceeding to trial.'"  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323-24).

Moreover, a federal court may not act as an advocate for a self-represented litigant.  *See Brock v. Carroll*, 107 F.3d 241, 242-43 (4th Cir. 1996); *Weller v. Dep't of Social Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).  Therefore, the Court cannot "conjure up questions never squarely presented," or fashion claims for a plaintiff because he is self-represented.  *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), *cert. denied*, 475 U.S. 1088 (1986); *see also M.D. v. Sch. Bd. of City of Richmond*, 560 Fed. App'x 199, 203 n.4 (4th Cir. 2014).  As the Fourth Circuit has said: "To do so would not only strain judicial resources by requiring those courts to explore exhaustively all potential claims of a pro se plaintiff, but would also transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party."  *Beaudett*, 775 F.2d at 1278.

## B.  Choice of Law

"When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).  Here, Maryland is the forum state.

The parties have not addressed choice of law.  They appear to assume, without discussion, that Maryland law applies.  But, on occasion, all parties cite to the law of other states as persuasive authority.

As to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g. Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

Plaintiffs' breach of contract claim (Count I) arises from the Deed. *See* ECF 1-2, ¶¶ 1-32. And, the Deed contains a choice of law clause that provides as follows: "This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located." ECF 1-2 at 32. "In Maryland, choice of law provisions in contracts are enforceable unless the choice of law jurisdiction has no substantial relationship to the transaction, or there is a fundamental policy difference in the laws of another jurisdiction with a more substantial interest in the parties or the transaction." *United States for use & benefit of Tusco, Inc. v. Clark Constr. Grp.*, 235 F. Supp. 3d 745, 752 n.9 (D. Md. 2016) (citing *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 921 A.2d 799, 803-05 (2011)); *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187.

The Property is located in Maryland. *See* ECF 1-2 at 28. The validity of the Deed and its choice of law provision are not in dispute. Accordingly, the Court will apply Maryland law with respect to Count I.

In tort actions, Maryland adheres to the rule of *lex loci delicti*, meaning it applies the substantive law of the state where the wrong occurred. *Ben-Joseph*, 529 F. Supp. 2d at 606 (citing *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 619, 925 A.2d 636, 648-49 (2007)) (other citations omitted); *see also DiFederico v. Marriott Int'l, Inc.*, 677 Fed. App'x 830, 833 (4th Cir. 2017). As to plaintiffs' tort claims—trespass (Count II) and invasion of privacy (Count III)—all of the alleged harms occurred in Maryland. Therefore, I will look to Maryland law with respect to the analysis of Count II and Count III.

### C.  Contract Law Principles

Principles related to contract formation, breach of contract, and contract interpretation are pertinent. I turn to review them.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 1990) ("Williston on Contracts"); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 1 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)), *cert. denied*, 405 Md. 63, 949 A.2d 652 (2008). Thus, mutual assent is an integral component of every contract. *See, e.g., Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708

(2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

A contract may be oral or written, as well as express or implied.  "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'"  *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cnty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)).  Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement.  *Forty W. Builders, Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974).  If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable.  *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

In determining whether there is an enforceable contract, courts in Maryland begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ."  *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations

42

omitted)).   "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

Moreover, a contract ordinarily is not enforceable unless it is supported by consideration. *Harford Cty. v. Town of Bel Air*, 348 Md. 363, 381, 704 A.2d 421, 430 (1998).   "In Maryland, consideration may be established by showing 'a benefit to the promisor or a detriment to the promisee.'"   *Forty W. Builders, Inc*., 178 Md. App. at 384-85, 941 A.2d at 1213 (citations and some internal quotation marks omitted).   The Maryland Court of Appeals has said: "A promise becomes consideration for another promise only when it constitutes a binding obligation. Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement."   *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 148, 835 A.2d 656, 661 (2003).

"Generally, a breach of contract is defined as a 'failure, without legal excuse, to perform any promise that forms the whole or part of a contract.'" *Weaver v. ZeniMax Media, Inc*., 175 Md. App. 16, 51, 923 A.2d 1032, 1052 (2007) (citing Williston on Contracts § 63:1).   Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'"   *Tucker v. Specialized Loan Servicing, LLC*, 83 F.Supp.3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 17 A.3d 744, 749 (2011)); *see also RRC Ne., LLC v. BAA Md., Inc*., 413 Md. 638, 658, 994 A.2d 430, 442 (2010) (noting the elements of contractual obligation and breach); *Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015) (same).   As a general rule, "a person cannot be held liable under a contract to which he was not a party."   *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 316, 728 A.2d 783, 794 (1999); *see also Weems v. Nanticoke Homes, Inc.*, 37 Md. App. 544, 551-57, 378 A.2d 190, 194-97 (1977).

Further, in Maryland "a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing'" the existence, and the breach, of a contractual obligation. *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012) (emphasis in original) (citation omitted). The agreement between the parties "ultimately determines" whether a breach occurred. *See Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005).

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). "'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intention, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement.").

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted)

(unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *W.F. Gebhardt & Co., Inc. v. American European Ins. Co.*, 250 Md. App. 652, 666, 252 A.3d 65, 73 (2021); *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted).   A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract subjectively intended or personally thought it meant.   *See Martz v. Day Development Co., L.C.,* ___ F.4th ____, 2022 WL 1634856, at *3 (4th Cir. May 24, 2022*); Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees' Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)); *see Cochran, 398 Md. 1, 919 A.2d at 710* ("Under the objective theory of contracts, [courts] look at what a reasonably prudent person in the same position would have understood as to the meaning of the agreement."); *Scarlett Harbor*, 109 Md. App. at 291, 674 A.2d at 142 ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated.").

Notably, "the plain meaning is determined by 'focus[ing] on the four corners of the agreement.'" *Martz*, 2022 WL 1634856, at *3 (citation omitted) (alteration in *Martz*). "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted).

"'Traditionally, to supply contractual language with its ordinary and accepted meanings[,] this Court consults the dictionary definition of such terms.'" *W.F. Gebhardt*, 250 Md. App. at 668, 252 A.3d at 74 (quoting *Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 394, 220 A.3d 303, 311 (2019)) (alteration in *Credible Behavioral Health*). "Furthermore, 'simply because [a party] can point to several slightly different dictionary definitions of [a word] does not render that term ambiguous.'" *W.F. Gebhardt*, 250 Md. App. 667, 252 A.3d at 74 (quoting *Rigby v. Allstate Indem.*, 225 Md. App. 98, 110, 123 A.3d 592, 598-99 (2015)) (alterations in *W.F. Gebhardt*).

A contract is ambiguous "'if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning.'" *Martz*, 2022 WL 1634856, at *3 (citation omitted); *see also Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999); *W.F. Gebhardt*, 250 Md. App. at 667, 252 A.3d at 74. But, a contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). And, the determination of whether a contract is ambiguous is a question of law. *Towson Univ.*, 384 Md. at 78, 862 A.2d at 946; *Sy-Lene of Washington*, 376 Md. at 163, 829 A.2d at 544.

To determine whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). Generally, "'ambiguities are resolved against the draftsman of the instrument.'" *John L. Mattingly Const. Co.*, 415 Md. at 334, 999 A.2d at 1078 (citation omitted). But, "'[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d 936, 942 (2001)).

Consideration of extrinsic evidence is unnecessary when a contract is unambiguous. *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted); *see Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006). Conversely, if the contract is ambiguous, "'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'" *Cty. Commissioners of Charles Cty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (citation omitted); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010); *see Point's Reach Condominium Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 213 Md. 152, 157-58, 582 A.2d 493, 495 (1990). For example, if a contract is ambiguous, "'extrinsic evidence may be consulted to determine . . .whether the ambiguous language has a trade usage.'" *Mut. Fire Ins. Co. of Calvert Cty. v. Ackerman*, 162 Md. App. 1, 15, 872 A.2d 110, 118 (2005) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 404, 488 A.2d 486, 497 (1985)); *see Della Ratta, Inc. v. Am. Better Cmty. Developers, Inc.*, 38

47

Md. App. 119, 130, 380 A.2d 627, 635 (1977).  But, extrinsic evidence may "not be used to contradict other, unambiguous language." *Calomiris*, 353 Md. at 441, 727 A.2d at 366.

If a court determines as a matter of law that the contract is ambiguous, "'it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.'" *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993)).  Nevertheless, if "'resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.'"  *Washington Metro. Area Transit Auth.*, 476 F.3d at 235 (quoting *Goodman*, 7 F.3d at 1126); *see Sheridan v. Nationwide Ret. Sols., Inc.*, 313 Fed. App'x 615, 619 (4th Cir. 2009).  Moreover, the court may construe an ambiguous contract only "'if there is no factual dispute in the evidence.'"  *CB Structures, Inc. v. Potomac Electric Power Co.*, 122 F. Supp. 3d 247, 251 (D. Md. 2015) (citation omitted); *see also Chorley Entrs. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 563 (4th Cir. 2015); *Pac. Indem. Co.*, 302 Md. at 389, 488 A.2d at 489.

## IV.    Discussion

### A.    Overview

To review, plaintiffs have brought claims for breach of contract (Count I), trespass (Count II), and intrusion upon seclusion (Count III).  *See* ECF 1-2.  Plaintiffs incorporate allegations of defendants' alleged theft, damage, and destruction of plaintiffs' personal property into their claims for breach of contract, trespass, and intrusion.

As an initial matter, Safeguard argues that it is entitled to summary judgment on the breach of contract claim because it is not a party to any contract with plaintiffs.  ECF 109-1 at 9-10.  And, PNC contends that, under principles of agency law, PNC cannot be vicariously liable for any tortious actions by Mr. Twesigye related to the alleged intentional theft or destruction of plaintiffs' property.  ECF 110-1 at 12-14; ECF 153 at 8-10.  Safeguard makes a similar argument, albeit in a footnote in its Reply.  ECF 152 at 19 n.14.

Beyond this, both Safeguard and PNC make the same core arguments.  They contend that consent provides a defense to all three of plaintiffs' claims—more specifically, that the Deed authorized inspections of the Property if plaintiffs were in default, and preservation activity if the Property was vacant, and that there is no genuine dispute of material fact that plaintiffs were in default and that the Property was vacant.  Thus, they maintain that plaintiffs consented to defendants' entries to the Property and to the preservation work.  ECF 109-1 at 10-14; ECF 110-1 at 9-12; ECF 152 at 6-16; ECF 153 at 4-8.

However, this argument would not justify defendants' alleged theft, damage, and destruction of plaintiff's personal property.  But, defendants assert that plaintiffs have presented no credible evidence that any such theft, damage, or destruction actually occurred.  ECF 109-1 at 14-16; ECF 152 at 17-19; ECF 153 at 7-8.  Furthermore, Safeguard asserts that plaintiffs have provided no evidence to support their damages claims.  ECF 109-1 at 14-16.  And, it maintains that if the Court declines to grant summary judgment, it should nevertheless strike plaintiffs' request for punitive damages, because plaintiffs have not adduced any evidence establishing actual malice.  *Id*. at 14-17.  In addition, in the Reply, PNC contends that plaintiffs' failure to show evidence of damages supports summary judgment in its favor as to the breach of contract claim.  ECF 153 at 7-8.

Not surprisingly, plaintiffs contest all of defendants' arguments. *See* ECF 134. They claim that, at the very least, they have created genuine disputes of material fact precluding summary judgment.

### B.  Safeguard—Breach of Contract Claim

With respect to plaintiffs' breach of contract claim against Safeguard, I agree that Safeguard is entitled to summary judgment.

As noted, as a general rule, "a person cannot be held liable under a contract to which he was not a party." *Residential Warranty Corp.*, 126 Md. App. at 316, 728 A.2d at 794; *see also Premium of America, LLC v. Sanchez*, 213 Md. App. 91, 121, 73 A.3d 343, 361 (2013); *Weems*, 37 Md. App. at 551-57, 378 A.2d at 194-97. "'The basic Maryland rule is that privity of contract is a prerequisite for recovery on that contract.'" *Titan Custom Cabinets, Inc. v. Truist Bank*, 505 F. Supp. 3d 558, 567 (D. Md. 2020) (quoting *Safer v. Perper*, 569 F.2d 87, 94 (D.C. Cir. 1977)). Here, plaintiffs assert breach of the Deed. *See* ECF 1-2, ¶¶ 1-32. But, Safeguard is indisputably not a party to the Deed. *See* ECF 1-2 at 27.

To be sure, the general rule quoted above is not absolute. Plaintiffs make several cursory arguments as to why a breach of contract claim against Safeguard can nevertheless be sustained. But, they are not persuasive. *See* ECF 134 at 20.

Plaintiffs note that Safeguard refers to itself as an "agent" of PNC. *See id.*; *see also* ECF 109-1 at 5, 10. Yet, Safeguard's MSA with PNC specifies: "[Safeguard] understands it shall serve as an independent contractor, and under no circumstances shall it be, or be deemed to be . . . [an] agent . . . of PNC." ECF 136-2 at 22. Regardless, even if Safeguard were considered an agent of PNC, this argument would be unavailing. "[A]n agent may be liable for his own acts of negligence." *E.G. Rock, Inc. v. Danly*, 98 Md. App. 411, 430, 633 A.2d 485, 494 (1993); *see Smith*

*v. Sherwood*, 308 F. Supp. 895, 899 (D. Md. 1970).  But, such liability would be a matter of tort—for example, plaintiffs' other two claims—rather than contract.

It is also well established that if an agent enters into a contract with a third party on behalf of a principal, but the principal is undisclosed or partially disclosed, "the agent is liable on the contract."  *Capital Centre, LLC. v. Wilkinson*, RDB-04-182, 2006 WL 827375, at *6 (D. Md. Mar. 27, 2006); *see Curtis G. Testerman Co. v. Buck*, 340 Md. 569, 576-77, 667 A.2d 649, 653 (1995).  However, this is far from the case here, where plaintiffs entered into a contract directly with PNC's predecessor in interest.  And, as a general matter, if the principal is fully disclosed, then the agent is not liable on the contract.  *See, e.g.*, *Becker v. Warren*, BPG-18-931, 2020 WL 6749960, at *4 (D. Md. Nov. 17, 2020); *Eremah v. Assurity Life Ins. Co.*, DKC-20-2069, 2020 WL 6154871, at *3 (D. Md. Oct. 20, 2020); *Capital Centre, LLC.*, 2006 WL 827375, at *6; *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 624 (D. Md. 2003); *Testerman*, 340 Md. at 576-77, 667 A.2d at 653; *Hill v. County Concrete Co., Inc.*, 108 Md. App. 527, 532-33, 672 A.2d 667, 670 (1996); *see also Thompson v. Naval Academy Athletic Ass'n*, RDB-12-2676, 2013 WL 3965100, at *5-6 (D. Md. Aug. 1, 2013) (dismissing breach of contract claim against agent).

As plaintiffs additionally note, Safeguard also refers to itself as a "third party beneficiary" of the Deed.  *See* ECF 134 at 20; *see also* ECF 109-1 at 5, 10.  "Ever since 1866 . . . Maryland, like most other jurisdictions, has recognized the doctrine of third party beneficiary."  *Parlette v. Parlette*, 88 Md. App. 628, 637, 596 A.2d 665, 669 (1991) (Motz, Diana, J.). "That doctrine permits a person for whose benefit a contract is made to maintain an action on it without any privity of contract."  *Id.*, 596 A.2d at 669-70; *see also, e.g., Cushman & Wakefield of Maryland, Inc. v. DRV Greentec, LLC*, 463 Md. 1, 7, 203 A.3d 835, 838 (2019); *120 West Fayette St., LLLP v. Mayor of Baltimore*, 426 Md. 14, 35-36, 43 A.3d 355, 368 (2012); *CX Reinsurance Co. Ltd. v.*

*Johnson*, 252 Md. App. 393, 403-04, 259 A.3d 174, 180 (2021); *Wm. T. Burnett Holding LLC v. Berg. Brothers Co.*, 235 Md. App. 204, 213, 175 A.3d 876, 881-82 (2017).

"In order for a person to recover as a third party beneficiary, he or she must show that the parties to the contract clearly intended that the third party benefit from it." *Parlette*, 88 Md. App. at 637, 596 A.2d at 670 (citing *Shillman v. Hobstetter*, 249 Md. 678, 687, 241 A.2d 570, 575 (1968). Moreover, it "'must clearly appear that the parties [to the contract] intend to recognize him as the *primary party* in interest and as privy to the promise.'" *Shillman*, 249 Md. at 688, 241 A.2d at 575 (quoting *Marlboro Shirt Co. v. American District Telegraph Co.*, 196 Md. 565, 569, 77 A.2d 776, 777 (1951)) (emphasis added). "An incidental beneficiary," in contrast, is "one who benefits from the contract although the benefit was not specifically intended or planned by the contracting parties." *Parlette*, 88 Md. App. at 637, 596 A.2d at 670. An incidental beneficiary "has no rights against the promisee or promisor." *Id.*[26]

Although a third party beneficiary may "bring suit in order to enforce the terms of a contract," *120 West Fayette St., LLLP*, 426 Md. at 36, 43 A.3d at 368, plaintiffs seek to make a third party beneficiary *liable* for breach of contract—a distinct proposition, for which they have provided no authority. Moreover, regardless of the term used by Safeguard in its briefing, there is no evidence in the record that the parties to the Deed "clearly intended" Safeguard to benefit from the Deed, much less to recognize Safeguard as the primary party in interest. The Deed certainly does not mention Safeguard. *See* ECF 1-27 at 27-38. At most, Safeguard is an incidental beneficiary of the Deed.

---

[26] Some recent cases have adopted the phrasing of "intended third party beneficiary" and "incidental third party beneficiary." *CX Reinsurance Co. Ltd.*, 252 Md. App. at 403-04, 259 A.3d at 180.

Finally, plaintiffs make a halfhearted argument that, "[w]hen Safeguard agreed to a drive by only," "[i]t entered into a verbal contract with Plaintiffs." ECF 134 at 20. It is unclear precisely to which event this refers, but it seems most likely to be a reference to Safeguard's call to Ms. Norris on November 14, 2017. ECF 79-3, call 15. In this call, Safeguard's representative told Ms. Norris that Safeguard's client (*i.e.*, PNC) was "abiding by" Ms. Norris's "request;" that "all work has stopped," that Safeguard would not be "back at the property," and that the Property was "reported as occupied." ECF 79-3, call 15. Although a contract may be verbal, there is no evidence to support the claim that the elements of contract formation were satisfied with this communication. For example, there was no consideration on the part of Safeguard. *See Cheek*, 378 Md. at 148, 835 A.2d at 661; *Town of Bel Air*, 348 Md. at 381, 704 A.2d at 430; *Forty W. Builders, Inc.*, 178 Md. App. at 384-85, 941 A.2d at 1213. Furthermore, the content of the call makes clear that Safeguard was merely following the instructions of PNC in its action.

In sum, plaintiffs have advanced no plausible ground to subject Safeguard to a breach of contract claim. Accordingly, I will grant summary judgment in favor of Safeguard as to Count I. I next turn to the parties' agency arguments.

### C.  Vicarious Liability and Agency

In its motion, PNC argues that, even if the record supported plaintiffs' allegations that Mr. Twesigye "intentionally damage[ed] and remov[ed] valuables from the Property," PNC could not be vicariously liable for such conduct. ECF 110-1 at 12. It argues that, to the extent that Mr. Twesigye is considered an agent of PNC, this particular conduct occurred outside the scope of his employment, and only for the benefit of Mr. Twesigye. *Id.* at 12-13. Alternatively, it contends that PNC cannot be vicariously liable because Mr. Twesigye was an independent contractor for PNC. ECF 110-1 at 13-14.

In Maryland, "[l]itigants may invoke the doctrine of respondeat superior as a means of holding an employer, corporate or otherwise, vicariously liable for the tortious conduct of an employee, where it has been shown that the employee was acting within the scope of the employment relationship at that time." *S. Mgmt. Corp. v. Taha*, 378 Md. 461, 480-81, 836 A.2d 627, 638 (2003); *see Barclay v. Briscoe*, 427 Md. 270, 282, 47 A.3d 560, 567 (2012); *Embrey v. Holly*, 293 Md. 128, 134, 442 A.2d 966, 969 (1982). The doctrine embodies the principle that, "[b]ecause 'the master holds out his servant as competent and fit to be trusted, . . . he in effect warrants his servant's fidelity and good conduct in all matters within the scope of his employment.'" *Oaks v. Connors*, 339 Md. 24, 30, 660 A.2d 423, 426 (1995) (*quoting Globe Indem. Co. v. Victill Corp.*, 208 Md. 573, 580, 119 A.2d 423, 427 (1956)).

"Generally, a principal is vicariously liable for the negligence of its agent when the two share a master-servant relationship but not when the agent is merely an independent contractor of the principal." *Hunt v. Mercy Med. Ctr.*, 121 Md. App. 516, 545, 710 A.2d 362, 376 (1998); *see also Appiah v. Hall*, 416 Md. 533, 558, 7 A.3d 536, 551 (2010) ("Generally, an 'employer of an independent contractor is not liable for the negligence of the contractor or his employees.'") (quoting *Rowley v. Baltimore*, 305 Md. 456, 461, 505 A.2d 494, 496 (1986)). In the taxonomy of agents, employee/servants, and independent contractors, a "'master is a species of principal and a servant is a species of agent,'" *Green v. H & R Block, Inc.*, 355 Md. 488, 510, 735 A.2d 1039, 1051 (quoting RESTATEMENT (SECOND) OF AGENCY § 2 cmt. a), and there are different "species" of independent contractor: those who are agents and those "from an entirely separate genus of 'non-agents.'" *Brooks v. Euclid Sys. Corp.*, 151 Md. App. 487, 517, 827 A.2d 887, 904, *cert. denied*, 377 Md. 276, 833 A.2d 31 (2003).

54

Put another way, "all masters are principals and all servants are agents, but only when the level of control is sufficiently high does a principal become a master and an agent a servant." *Green*, 355 Md. at 509, 735 A.2d at 1051. "'Agents who are not servants are regarded as independent contractors.'" *Brooks*, 151 Md. App. at 517, 827 A.2d at 904 (quoting *Sanders v. Rowan*, 61 Md. App. 40, 50, 484 A.2d 1023, 1028 (1984)). But, "[n]ot all independent contractors are agents. 'A person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other, is a non-agent independent contractor.'" *Brady v. Ralph Parsons Co.*, 308 Md. 486, 510 n.26, 520 A.2d 717, 730 n.26 (1987) (citing RESTATEMENT (SECOND) OF AGENCY §§ 2 cmt. b, 14N cmt. b) (internal citations omitted); accord *Brooks*, 151 Md. App. at 517, 827 A.2d at 904.

"Ordinarily, the issue of whether a particular act is within the scope of employment is properly decided by a jury . . . ." *Barclay*, 427 Md. at 283, 47 A.3d at 568. It is only where there is "'no conflict in the evidence relating to the question and but one inference can be drawn therefrom'" that the issue becomes a "'question . . . of law for the court.'" *Id*. (citation omitted). Moreover, "there are few, if any, absolutes" in assessing whether an employee's act is within the scope of employment. *Sawyer v. Humphries*, 322 Md. 247, 255, 587 A.2d 467, 471 (1991); *see also Balt. City Police Dep't v. Potts*, 468 Md. 265, 306, 277 A.3d 186, 210 (2020).

The general rule is that, "[f]or an employee's tortious acts to be considered within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer." *Taha*, 378 Md. at 481, 836 A.2d at 638. However, this general benchmark is not susceptible of mechanical application. "By 'authorized' [it] is not meant authority expressly conferred [by the employer], but whether the act was such as was incident to the performance of the duties entrusted to the employee by the employer, even [if] in opposition to his express and

positive orders." *Sawyer*, 322 Md. at 255, 587 A.2d at 470 (citations and some internal quotation marks omitted). "Accordingly, 'an act may be within the scope of employment, even though forbidden or done in a forbidden manner, or consciously criminal or tortious . . . .'" *Tall v. Bd. of Sch. Comm'rs of Baltimore City*, 120 Md. App. 236, 252, 706 A.2d 659, 667 (1998) (*quoting Great Atl. & Pac. Tea Co. v. Noppenberger*, 171 Md. 378, 391, 189 A. 434 (1937)).

As noted, courts assess whether "an employee's tortious acts were within the scope of his employment" by analyzing "whether they were in furtherance of the employer's business and were 'authorized' by the employer." *Khatami v. Compton*, 844 F. Supp. 2d 654, 659 (D. Md. 2012) (citing *Sawyer*, 322 Md. at 255, 587 A.2d at 470). Whether an employee's act "furthers his master's business" is evaluated "under the totality of the circumstances." *Id*. The factors that bear on this evaluation include "(1) whether the employer should expect or foresee the conduct; (2) whether the conduct is similar to the conduct the employer authorizes; and (3) whether the conduct is close in time and space to the employee's job duties." *Id*. An employee's actions may be "in furtherance of" an employer's business when they were "at least partially motivated by a purpose to serve the" employer, and when "there is no indication that the [employees] were 'acting to protect [their] own interest[.]'" *Potts*, 468 Md. at 306, 227 A.3d at 211 (quoting *Sawyer*, 322 Md. at 255-57, 587 A.2d at 470-71) (first alteration mine; remainder in *Potts*).

Thus, one factor "is whether the 'employee's conduct was 'expectable' or 'foreseeable'.'" *Sage Title Grp., LLC v. Roman*, 455 Md. 188, 213, 166 A.3d 1026, 1040 (2017) (*quoting Sawyer*, 322 Md. at 256, 587 A.2d at 470), *reconsideration denied* (Sept. 21, 2017). In *Sage Title*, the Maryland Court of Appeals found sufficient evidence for a trier of fact to conclude that an employee's illegal acts were committed within the scope of his employment. *Id*. at 213-15, 166 A.3d at 1040-41. The court based its conclusion on three findings: (1) the employee was

authorized to perform activities very similar to the tortious ones in question (*id*. at 213-14, 166 A.3d at 1040-41); (2) there was "no question that [the employee] was acting 'in furtherance of the employer's business and authorized by the employer'" (*id*. at 214, 166 A.3d at 1041); and (3) the tortious acts were foreseeable to his employer because the employer had knowledge that the employee had previously violated a related company policy. *Id*. at 214-15, 166 A.3d at 1041.[27]

Nevertheless, "where an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests," the actions will ordinarily be considered outside the scope of employment, even if they occur "during normal duty hours and at an authorized locality." *Sawyer*, 322 Md. at 256-57, 587 A.2d at 471.  And, "'[w]here the conduct of the servant is unprovoked, highly unusual, and quite outrageous,' courts tend to hold 'that this in itself is sufficient to indicate that the motive was a purely personal one' and the conduct outside the scope of employment." *Id*. at 257, 587 A.2d at 471 (quoting PROSSER AND KEETON ON THE LAW OF TORTS § 70, at 506 (5th ed. 1984)).  However, "[t]his language does not establish a hard-and-fast rule." *Potts*, 468 Md. at 312, 227 A.3d at 214.

Even assuming the existence of a master-servant relationship that could give rise to PNC's liability, no evidence has been identified to create a jury question as to whether Mr. Twesigye's alleged intentional theft, damage, or destruction of plaintiffs' personal property was within his scope of employment.  PNC hired Safeguard to perform property preservation services.  ECF 110-4, ¶¶ 7, 8, 11.  In turn, Safeguard hired Alpha and Mr. Twesigye to do the same.  *Id*. ¶ 11; ECF 109-4, ¶ 3.  Sarah Greggerson avers that "PNC expects that any person performing an inspection

---

[27] Although foreseeability is "an important factor," *Sawyer*, 322 Md. at 256, 587 A.2d at 471, I am unaware of any reported Maryland case in which an employer has been held vicariously liable based solely on the foreseeability of the employee's conduct.

at a residential property securing a PNC mortgage loan will not in any way damage the residential property or remove valuable items from it," and that any such activity "would be outside the scope of the tasks assigned to property inspectors by PNC."  ECF 110-4, ¶ 13.  The MSA between PNC and Safeguard (ECF 136-2 at 15-45), and the equivalent document between Safeguard and Alpha (*id*. at 1-3), contain various provisions as to the work to be performed by Safeguard and Alpha.

Of course, nothing in the scope of work for Safeguard or Alpha authorized or contemplated any theft or destruction of personal property.  Nor has any evidence been presented that any intentional theft, damage, or destruction was in any way condoned by PNC.  Moreover, there is no evidence that  such conduct furthered PNC's business or interests, or that it was to PNC's benefit.  There is no evidence that such conduct was similar to anything authorized by PNC.  There is no evidence that Alpha or Mr. Twesigye previously violated any PNC policy, or that if they did, PNC had knowledge of it, an issue the Maryland Court of Appeals found important in *Sage Title*, 455 Md. at 214-15, 166 A.3d at 1041.  Rather, to the extent any intentional theft, damage, or destruction occurred, it bears all the hallmarks of the "'unprovoked'" and "'outrageous'" conduct that courts tend to hold falls outside the scope of employment.  *Sawyer*, 322 Md. at 257, 587 A.2d at 471 (internal citation omitted).  Any such actions would have been in service of Mr. Twesigye's own interests, not those of PNC.  *See Potts*, 468 Md. at 306, 227 A.3d at 211.

Although I am not aware of any Maryland case law on point, this conclusion is consistent with other cases involving analogous circumstances.  *See, e.g.*, *Schloss v. Sears Roebuck & Co*., No. Civ. A. 04-CV-2423, 2005 WL 433316, at *2 (E.D. Pa. Feb. 24, 2005); *Norboe v. Wells Fargo Bank, N.A.*, NNH-CV-136038377, 2018 WL 1137575, at *7-8 (Conn. Super. Ct. Jan. 31, 2018); *Brown-Spurgeon v. Paul Davis Systems of Tri-State Area, Inc*., No. CA2012-09-069, 2013 WL 1883214, *3-4 (Ohio App. May 6, 2013); *Starr v. Leininger*, 198 Ill. App. 3d 622, 623-24, 556

N.E.2d 266, 267-68 (Ct. App. 1990); *Gotthelf v. Property Management Systems, Inc.*, 189 N.J. Super. 237, 240-41, 459 A.2d 1198, 1199-1201 (App. Div.), *cert. denied*, 95 N.J. 219, 470 A.2d 435 (1983). As the court said in *Norboe*, 2018 WL 1137575, at *8, which surveyed the issue of lender vicarious liability for intentional torts by property preservation vendors and collected cases: "No doubt [the property preservation subcontractors'] job status provided them with unsupervised access to plaintiff's property. But a principal does not incur vicarious liability for the intentional misconduct of its agent merely because an unscrupulous agent discovers that his work assignment facilitates the easy commission of a crime."

Plaintiffs' only substantive response is that the overall winterization and property preservation services performed by Mr. Twesigye, which they assert caused damages, were for PNC's benefit, and within his scope of employment. ECF 134 at 39-40. This is certainly true, but it misses the point. PNC's argument has to do specifically with Mr. Twesigye's alleged intentional damage to, and theft of, plaintiffs' "valuables." ECF 110-1 at 12. This is a different category of conduct, and clearly beyond the scope of Mr. Twesigye's employment, as I have discussed.

Thus, I will grant summary judgment to PNC as to any vicarious liability for the intentional theft, damage, and destruction of plaintiffs' personal property by Mr. Twesigye. However, this grant of summary judgment does not extend to any alleged property damage that resulted specifically from Mr. Twesigye's actions to winterize and secure the Property.

Because PNC has established that the alleged theft and destruction of personal property by Mr. Twesigye was not within the scope of employment, there is no need to consider PNC's alternative contention that Mr. Twesigye was an independent contractor. *See* ECF 110-1 at 13-14. In any event, this is a question that is typically the province of a jury. *See, e.g.*, *Taha*, 378 Md. at 481 n.6, 836 A.2d at 639 n.6; *Green*, 355 Md. at 505, 735 A.2d at 1048; *Great Atl. & Pac. Tea Co.*

*v. Imbraguglio*, 346 Md. 573, 590, 697 A.2d 885, 893 (1997); *Faya v. Almaraz*, 329 Md. 435, 460, 620 A.2d 327, 339 (1993); *P. Flanigan & Sons v. Childs*, 251 Md. 646, 653, 248 A.2d 473, 477 (1968); *Levine v. Chambers*, 141 Md. 336, 343, 118 A. 798, 800 (1922).

Safeguard also makes a similar argument that, "[e]ven if Safeguard's vendor did steal or damage property, which it did not, such conduct would undeniably be outside the scope of its employment and was not for the benefit of Safeguard." ECF 152 at 19 n.14. However, it does so only in a cursory fashion, in a footnote in its Reply. *See id.* "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006); *see also De Simone v. VSL Pharmaceuticals*, ___ F.4th ___, 2022 WL 2036293, at *7 (4th Cir. June 7, 2022). Accordingly, I do not consider Safeguard's argument on this issue.

I proceed to the core issue of whether defendants' preservation work at the Property was lawful in the first place.

### D.  Whether Plaintiffs Consented to the Defendants' Alleged Actions

### 1.

As noted, Safeguard and PNC's core defense to all three counts turns on consent—namely, that plaintiffs consented to defendants' work via the Deed, and that there is no evidence that defendants performed any work that exceeded the scope of consent.

I have already set forth the elements of a breach of contact claim. Obviously, a breach of contract claim cannot succeed unless a breach of the contract has actually occurred. *See, e.g.*, *Tucker*, 83 F. Supp. 3d at 655; *Polek*, 424 Md. at 362, 36 A.3d at 416; *RRC Ne., LLC*, 413 Md. at 658, 994 A.2d at 442. Therefore, if all of defendants' actions were authorized by the Deed, then there was no breach of the Deed, and plaintiffs' breach of contract claim must fail.

"The longstanding common law tort of trespass is generally defined as 'an intentional or negligent intrusion upon or to the possessory interest in property of another.'" *Uthus v. Valley Mill Camp, Inc.*, 472 Md. 378, 401, 246 A.3d 1225, 1239 (2021). "'In order to prevail on a cause of action for trespass, the plaintiff must establish: (1) an interference with a possessory interest in his property; (2) through the defendant's physical act or force against that property; (3) which was executed without his consent.'" *Royal Investment Grp., LLC v. Wang*, 183 Md. App. 406, 445, 961 A.2d 665, 688 (2008) (citation omitted), *cert. granted*, 408 Md. 149, 968 A.2d 1064, *appeal dismissed before argument*, 409 Md. 413, 975 A.2d 875 (2009); accord *Uthus*, 472 Md. at 401, 246 A.3d at 1239.

As the third element of trespass reflects, "consent, either expressed or implied, constitutes a complete defense" to trespass, "so long as the scope of that consent is not exceeded." *Mitchell v. Balt. Sun Co.*, 146 Md. App. 497, 508, 883 A.2d 1008, 1014-15 (2005); *see also Baltimore Gas and Elec. Co. v. Flippo*, 348 Md. 680, 689, 705 A.2d 1144, 1148 (1998) (defining "trespasser" as "'one who intentionally and *without consent* or privilege enters another's property'") (emphasis added) (internal citation omitted); *Brazerol v. Hudson*, 262 Md. 269, 273, 277 A.2d 585, 587 (1971) (holding that an "authorized entry . . . was no trespass"); *Bittner v. Huth*, 162 Md. App. 745, 752-53, 876 A.2d 157, 161 (2005) ("'Every unauthorized entry upon the land of another is a trespass . . .'") (internal citation omitted).

Of relevance here, if the Deed authorized entry into or onto the Property, but once inside defendants damaged or destroyed property in a manner not authorized by the Deed, then this could still constitute a trespass, because the entry would have exceeded the scope of consent. *See Hardie v. Deutsche Bank Trust Co. America*, 544 F. Supp. 3d 547, 557 (D. Md. 2021) (finding, on a similar set of alleged facts, that plaintiffs stated a claim for trespass by alleging the removal of personal

property, because such actions "were outside of the scope of activity agreed to and authorized in the Deed of Trust"); *Pruitt v. Wells Fargo Bank, N.A.*, DKC-15-1308, 2015 WL 9490234, at *10-11 (D. Md. Dec. 30, 2015) (analysis for breach of contract claim when alleged actions authorized by Deed of Trust).

"Intrusion upon seclusion is one of the torts under invasion of privacy." *Demo v. Kirksey*, PX-18-00716. 2018 WL 5994995, at *3 (D. Md. Nov. 15, 2018) (citing *Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 161, 502 A.2d 1101, 1115 (1986)). Intrusion upon seclusion occurs where there is an "intentional intrusion upon the solitude or seclusion of another or her private affairs or concerns that would be highly offensive to a reasonable person." *Furman v. Sheppard*, 130 Md. App. 67, 73, 744 A.2d 583, 585 (2000) (citing RESTATEMENT (SECOND) OF TORTS § 652B); *see Gamble v. Fradkin & Weber, P.A.*, 846 F. Supp. 2d 377, 383 (D. Md. 2012); *see Lipscomb v. Aargon Agency, Inc.*, PWG-13-2751, 2014 WL 5782040, at *2 (D. Md. Nov. 5, 2014); *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 525-26, 687 A.2d 1375, 1380-81 (1997); *Mitchell v. Balt. Sun Co.*, 164 Md. App. at 522, 883 A.2d at 1022. A trespass does not necessarily establish intrusion upon seclusion. Rather, a "trespass 'becomes relevant only when it invades a defendant's reasonable expectation of privacy.'" *Furman*, 130 Md. App. at 74, 744 A.2d at 586 (citation omitted). Again, consent may be a defense to intrusion upon seclusion. *See Mitchell*, 164 Md. App. at 521-24, 883 A.2d at 1022-24.[28]

A plethora of cases in this District and elsewhere reflect that consent under a deed of trust or similar instrument is a valid defense in the context of claims premised on property preservation work. *See, e.g.*, *Galvin v. U.S. Bank, N.A.*, 852 F.3d 146, 162-65 (1st Cir. 2017) (trespass); *Hardie*,

---

[28] I note that, apart from their consent arguments, defendants have not generally challenged whether plaintiffs have established an intrusion upon seclusion claim.

544 F. Supp. 3d at 556-57 (trespass); *Pruitt*, 2015 WL 9490234, at *8-11 (trespass and breach of contract); *Vinal v. Fed. Nat'l Mortgage Ass'n*, 131 F. Supp. 3d 529, 540 (E.D.N.C. 2015) (trespass); *Thompson v. JPMorgan Chase Bank, N.A.*, WDQ-13-1982, 2014 WL 4269060, at *6-7 (D. Md. Aug. 27, 2014) (trespass); *McCray v. Specialized Loan Servicing*, RDB-12-2200, 2013 WL 1316341, at *4-6 (D. Md. Mar. 28, 2013) (breach of contract); *Bennett v. Bank of America, N.A.*, No. 3:12CV34-HEH, 2012 WL 1354546, at *10 (E.D. Va. Apr. 12, 2012) (trespass); *Sharma v. OneWest Bank, FSB*, DKC-11-0834, 2011 WL 5167762, at *4-5 (D. Md. Oct. 28, 2011) (breach of contract); *Boskent v. Belvedere Council of Unit Owners*, No. 1490, 2022 WL 669249, at *1-3 (Md. Ct. Spec. App. Mar. 7, 2022) (trespass);[29] *Hanson-Metayer v. Rach*, No. 737, 2018 WL 5045773, at *17-18 (Md. Ct. Spec. App. Oct. 17, 2018) (trespass and intrusion upon seclusion).

To review, the Deed provides, in relevant part (ECF 1-2 at 30) (boldface in original):

> **5.  Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** . . . Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted.  Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default.  Lender may take reasonable action to protect and preserve such vacant or abandoned Property. . . .

It is not in dispute that, at the time of the entries, the Mortgage was in default.  *See* ECF 110-4, ¶ 10; ECF 134 at 6.  Thus, under the unambiguous language of Paragraph 5, PNC had the right to "inspect the Property."  ECF 1-2 at 30.

However, defendants did more than simply "inspect" the Property.  It is undisputed that Mr. Twesigye, on behalf of Safeguard and PNC, performed various property preservation services,

---

[29] *Boskent* was a suit brought by Ms. Norris, under her maiden name, relating to the Belvedere Property, and presenting somewhat similar facts. However, unlike here, the trial court's ruling was based upon certain admissions Ms. Norris was deemed to have made based on her failure to respond to discovery. *See* 2022 WL 669249, at *1-3.

such as changing certain locks and winterizing the Property.  *See, e.g.*, ECF 109-4, ¶¶ 3, 6-9; ECF 110-4, ¶ 14; ECF 136-1 at 28 (Tr. at 161-62).  These actions implicate the sentence in Paragraph 5 authorizing "reasonable action to protect and preserve such vacant or abandoned Property."  ECF 1-2 at 30.  Contrary to Safeguard's assertion at one point (*see* ECF 109-1 at 11), the Deed does not authorize these Property preservation services merely because the loan is in default.  Rather, the unambiguous language of Paragraph 5 only authorizes actions to protect and preserve the Property if it is "vacant or abandoned."  ECF 1-2 at 30 (referring to "such vacant or abandoned Property").

Safeguard initially seems to argue that the Property was vacant *or* abandoned.  ECF 109-1 at 12-14.  However, in its Reply, Safeguard argues only that the Property was vacant.  ECF 152 at 6-14.  And, PNC argues only that the Property was vacant.  ECF 110-1 at 11-12; ECF 153 at 4-7.  Therefore, the question is whether the Property was vacant at the time of the entries and, if so, whether defendants' conduct constituted reasonable actions to protect and preserve the Property.

**2.**

The Deed does not define "vacant" and the parties dispute the term's meaning.  The interpretation of a contract is "ordinarily a question of law for the court."  *Grimes*, 232 Md. App. at 235, 157 A.3d at 335.

Defendants argue that, in this context, "vacant" means "unoccupied."  ECF 152 at 6-10; ECF 153 at 5-7.  Plaintiffs' position is less clear, but they appear to advocate for a narrower definition of vacant that is closer to abandoned or completely empty, such that a property is not vacant if possessions are kept at the property, or if the property is habitually visited.  *See* ECF 134 at 9, 16, 26-27.  Plaintiffs also appear to argue at certain points that the standard is not actually "vacant," or that the standard is actually "vacant *and* abandoned."  *See, e.g., id*. at 28 (emphasis

added).   But, the language of the Deed is clear that the Property need only be "vacant *or* abandoned*"* to authorize preservation activities.  ECF 1-2 at 30 (emphasis added).

To determine the definition of vacant, the Court looks to the "ordinary and usual meaning" of the word, in light of its context.  *DIRECTV, Inc.*, 376 Md. at 313, 829 A.2d at 632-22; *see also Martz*, 2022 WL 1634856, at *3.  Dictionaries may be used to help determine this meaning.  *W.F. Gebhardt*, 250 Md. App. at 667-68, 252 A.3d at 74.  Dictionaries point to a range of meanings for "vacant," depending on the context.  For the most relevant context ("vacant" in the sense of "vacant houses"), the Merriam-Webster Online Dictionary defines the word to mean "not lived in." MERRIAM-WEBSTER ONLINE DICTIONARY, https://bit.ly/3GFhj3w (last accessed May 31, 2022) ("Vacant").  For its part, for the most relevant context ("vacant" in the sense of "land, houses, etc."), the Oxford English Dictionary defines "vacant" to mean: "Uninhabited, unoccupied, untenanted."  OXFORD ENGLISH DICTIONARY, https://bit.ly/3t79Qob (last accessed May 31, 2022) ("Vacant").  And, Black's Law Dictionary defines "vacant" as: "Empty; unoccupied <a vacant office>."  BLACK'S LAW DICTIONARY (11th ed. 2019) ("Vacant").[30]

In my view, the ordinary and unambiguous meaning of the word "vacant," in the context of the Deed, is that the Property is "not lived in," as in the Merriam-Webster definition.  This is so even if "vacant" is equivalent to "unoccupied," as defendants posit, which merely invites the question of the definition of "unoccupied."

---

[30] Black's Law Dictionary also states: "Courts have sometimes distinguished *vacant* from *unoccupied*, holding that *vacant* means completely empty while *unoccupied* means not routinely characterized by the presence of human beings."  BLACK'S LAW DICTIONARY (11th ed. 2019) ("Vacant") (emphases in original).  But, as Safeguard notes (ECF 152 at 7-8), this "completely empty" definition has generally referred to land, rather than dwellings. *See Morton v. Gardner*, 488 F. Supp. 3d 200, 209-10 (W.D. Pa. 2020) (discussing this issue).

I am not aware of any Maryland case law considering the definition of "vacant" in this context.  However, the Maryland Court of Appeals has recognized an unambiguous definition of "vacant *or* unoccupied" in the context of insurance contracts relating to a "'dwelling or place of abode.'"  *Khoshmukhamedov v. State Farm Fire and Cas. Co.*, 946 F. Supp. 2d 443, 447 (D. Md. 2013) (quoting *Norris v. Conn. Fire Ins. Co. of Hartford*, 115 Md. 174, 80 A. 960, 961 (1911)) (emphasis added).  A dwelling is "'vacant or unoccupied'" "'so long as it ceases to be a place of actual abode,—a place really occupied as a residence or habitation.'"  *Id*. at 447 (quoting *Norris*, 115 Md. 174, 80 A. at 961).  The definition of vacant that I adopt in this context—meaning "not lived in"—is consistent with this definition, and merely a succinct restatement of it.

*Catalina Enterprises, Inc. Pension Fund v. Hartford Fire Ins. Co.*, 67 F.3d 63 (4th Cir. 1995) ("*Catalina*"), is informative, although not precisely on point.  *Catalina*, which applied Maryland law, concerned whether a warehouse was "vacant" for purposes of the building's insurance policy.  *Id*. at 64.  The insurance contract defined "vacant" to mean that the building contained "no contents pertaining to operations or activities customary to occupancy of the building." *Id*.  But, the Fourth Circuit ruled that the warehouse was vacant, despite the fact that it contained a handful of minor items.  *Id*. at 66-67.  Moreover, the Court concluded that the plaintiff's "strict, literal reading" of the definition of "vacant" was at odds with its natural reading, under which "a building is vacant when it contains nothing in it to indicate that the building is occupied or being used for the purpose for which it normally is used when occupied." *Id*.

The Eighth Circuit has described *Catalina* as rejecting "the definition of 'vacant' as 'devoid of contents,'" to instead "focus on the presence or absence of objects or activities customary for the property's intended use."  *Vennemann v. Badger Mut. Ins. Co.*, 334 F.3d 772, 773 (8th Cir.

2003).  Likewise, the meaning of vacant adopted here focuses on the Property's intended use—as a residence—rather than whether it is, for example, completely empty of personal property.

This definition is also in accord with the overall purpose and context of Paragraph 5.  *Cf. Pac. Indem. Co.*, 302 Md. at 388, 488 A.2d at 488.  The plain purpose of this portion of Paragraph 5 is to allow PNC, given its financial interest in the Property, to act to ensure that the Property is maintained, and does not deteriorate, regardless of the status of plaintiffs.  *See* ECF 1-2 at 30.[31] As PNC notes (*see* ECF 153 at 5), this concern is implicated regardless of whether some of plaintiffs' possessions remain at the Property, or whether the Property is occasionally visited by plaintiffs.  *See Catalina*, 67 F.3d at 66-67 (looking to the "broader intention of the parties" as avoiding fire risks when interpreting the definition of "vacant").  On the other hand, this definition avoids plaintiffs' hypothetical (*see* ECF 134 at 26) that a property could be found vacant if its residents are merely traveling, or out at work, as clearly, in such a situation, the property would still be "lived in."  "It is axiomatic under Maryland law that a court should avoid reading a contract in a way that produces an absurd result, especially when a reasonable interpretation is available." *Catalina*, 67 F.3d at 66.

Plaintiffs assert that the Property could not be considered vacant because no court had found the property to be "vacant and abandoned" under R.P. § 7-105.18.  *See* ECF 134 at 28, 41, 49.  This argument is incorrect.  R.P. § 7-105.18 establishes a process by which a secured party may proceed to an immediate foreclosure of a property found by the court to be vacant and abandoned, after a petition from the secured party and according to specified criteria.  But, the

---

[31] If the provision is considered ambiguous, meaning the Court may look to extrinsic evidence, this purpose is reinforced. *See, e.g.*, ECF 1-2 at 88 (PNC letter, explaining purpose of property preservation); ECF 110-4, ¶ 6 (Greggerson Decl., explaining purpose of property preservation); *see also* FEDERAL HOUSING ADMIN., MORTGAGEE LETTER 2016-02 at 1-2 (Feb. 5, 2016).

rights at issue here originate from the Deed; the issue is whether the Property was "vacant" within the meaning of the Deed, such that defendants could undertake preservation activities.

Simply put, R.P. § 7-105.18 does not govern here.  Likewise, there is no basis for plaintiffs' assertion that a property is only considered vacant if no one has lived there for at least thirty consecutive days.  *See* ECF 134 at 26-27.  The sole basis for this contention appears to be an 1883 Wisconsin statute defining vacancy for tax collection purposes, which is of no relevance here.  *See id*.

On the other hand, PNC seems to assert that the relevant issue is whether Mr. Twesigye, when he inspected the Property, reasonably determined it to be vacant.  *See* ECF 110-1 at 11; ECF 153 at 4-5, 7.  But, this is not what the Deed says.  Paragraph 5 states that the PNC may take reasonable action to protect and preserve a "vacant or abandoned Property," not property its inspector reasonably believed to be vacant.  ECF 1-2 at 30.

"Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed."  *Hartford Acc. & Indem. Co.*, 109 Md. App. at 291, 674 A.2d at 142.  The case law surveyed above looks to whether a triggering event has occurred to permit inspection or property preservation by the lender, not whether the lender has reasonably determined it has occurred.  *See, e.g.*, *Galvin*, 852 F.3d at 163; *Hardie*, 544 F. Supp. 3d at 556-57; *Pruitt*, 2015 WL 9490234, at *10-11; *Vinal*, 131 F. Supp. 3d at 540; *Thompson*, 2014 WL 4269060, at *7; *McCray*, 2013 WL 1316341, at *5; *Bennett*, 2012 WL 1354546, at *10; *Sharma*, 2011 WL 5167762, at *5.  Although Mr. Twesigye's observations and conclusions are certainly relevant as to the analysis of vacancy, the ultimate question is whether the Property *was* vacant, not whether he reasonably determined that it was vacant.

68

With vacant thus defined, it is evident that there is a genuine dispute of material fact as to whether the Property was vacant, *i.e.*, whether it was lived in at the time of the entries.

To be sure, there is ample indicia that the Property was, indeed, vacant.    It is clear that Mr. Norris was not living at the Property at the time of the entries.  ECF 109-2 at 4 (Tr. at 54); ECF 109-3 at 4-6 (Tr. at 29-31); ECF 110-2 at 6 (Tr. at 44).  And, the evidence that plaintiffs' son stayed at the Property is scant.  ECF 109-2 at 52-53 (Tr. at 184-85).  Mr. Norris testified that Ms. Norris would "regularly stay" at the Belvedere Property (ECF 136-1 at 38 (Tr. at 32)), and Ms. Norris acknowledged that she would stay at the Belvedere Property at least some of the time.  ECF 109-2 at 6, 9, 51-52 (Tr. at 56, 59, 183-84).  Plaintiffs were not at the Property during any of the entries made by Mr. Twesigye; when Ms. Norris discovered Mr. Twesigye's entries on October 26, 2017, she had not been at the Property in six days, and could not recall the last time she had slept there.  ECF 136-1 at 14 (Tr. at 90); ECF 109-2 at 55 (Tr. at 187); ECF 136-1 at 31 (Tr. at 189-90).  The previous year, in October and December 2016, Ms. Norris stated during her bankruptcy proceedings that she lived at the Belvedere Property.  ECF 140-1 at 8; ECF 140-2 at 3-4, 7.

Moreover, as the saying goes, a picture is worth a thousand words.  The photographic evidence, whether from Safeguard or plaintiffs, is powerful evidence that the Property was not habitable at the relevant time.  A factfinder could conclude that the photographs are consistent with a vacant Property.  For example, the state of the yard, as well as the furniture, possessions, and apparent debris piled in the interior, suggest that the Property was vacant.  ECF 109-4, ¶¶ 4, 5; *id*. at 4-73; ECF 137-1 to ECF 137-15; ECF 138.  And, many of the explanations offered by plaintiffs for the condition of the Property—from the idea that the photos were "staged" by defendants to the supposed ecological rationale for the condition of the yard—are flimsy, at best.

Similarly, plaintiffs contend that the Property was under renovation. *See, e.g.*, ECF 109-2 at 8 (Tr. at 58); ECF 109-3 at 4 (Tr. at 29). Yet, they do not suggest how they were in a position to remodel while the mortgage was in default. Certainly, a reasonable jury could readily reject these assertions and conclude that the Property was vacant.[32]

But, viewing the facts in the light most favorable to plaintiffs, as I must at this juncture, a reasonable jury could choose to credit plaintiffs' contention that the Property was not, in fact, vacant. *See Ricci*, 557 U.S. at 585-86; *Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

For example, Mr. Norris testified that Ms. Norris and plaintiffs' son would stay at the Belvedere Property only "occasionally," and that in "the last three or four months of 2017," Ms. Norris "was more" at the Property. ECF 110-2 at 6 (Tr. at 44). And, Ms. Norris testified that in 2017 she stayed at the Property at least as often as she stayed at the Belvedere Property, and was "probably" more often at the Property. ECF 109-2 at 52 (Tr. at 184). In addition, plaintiffs received their mail at the Property. ECF 136-1 at 40-41 (Tr. at 39, 42-44). Moreover, they repeatedly informed defendants, during this period, that the Property was occupied and not vacant. *See, e.g.*, ECF 1-2 at 91, 92; ECF 79-3, calls 1, 12, 13, 16; ECF 136-1 at 12-13 (Tr. at 84-85); ECF 136-3 at 34. And, inspections of the Property by defendants in August and September 2017 recorded the Property as occupied, with the inspector during the September inspection encountering a man who answered the door. ECF 136-3 at 26-29; *see also* ECF 145 at 1.

As noted, plaintiffs testified that the Property was being remodeled at the time (ECF 109-2 at 4, 8 (Tr. at 54, 58); ECF 109-3 at 4 (Tr. at 29)), and argue that the interior condition of the

---

[32] A factfinder could also discredit the plaintiffs' claims, given that Ms. Norris previously lodged somewhat similar accusations against a mortgage holder with respect to the Belvedere Property. *See Boskent*, 2022 WL 669249.

Property was the result of remodeling, not vacancy. ECF 134 at 17. Indeed, some of the photographs are consistent with remodeling, depicting paint cans or tarps on the furniture. *See, e.g.*, ECF 109-4 at 57-61.

To be sure, the fact that plaintiffs asserted to defendants that the Property was occupied, and not vacant, does not necessarily mean that this was true. *See, e.g.*, *Galvin*, 852 F.3d at 164. But, in this regard, it is significant that defendants themselves apparently found the Property to be occupied on certain occasions. ECF 136-3 at 26-29; ECF 145 at 1. Moreover, defendants actively sought information from plaintiffs as to whether the Property was occupied, and in some cases adhered to plaintiffs' requests to stop Property preservation work and record the Property as occupied. *See* ECF 1-2 at 91; ECF 79-3, call 15, 16; ECF 136-3 at 2-3. Indeed, a Safeguard representative apologized to Ms. Norris in the call of December 21, 2017, for what the representative referred to as an "invasion" of the Property. ECF 79-3, call 18.

Defendants label the evidence supporting plaintiffs' position as inconsistent or self-serving. *See* ECF 109-1 at 4-7, 13-14; ECF 152 at 10-14; ECF 153 at 4-7. But, plaintiffs have consistently claimed the Property was not vacant. It is not clear that the inconsistencies are as glaring as defendants assert. For example, Mr. Norris's testimony that Ms. Norris "regularly" stayed with him at the Belvedere Property (ECF 136-1 at 38 (Tr. at 32)) does not necessarily contradict Ms. Norris's testimony that she stayed at both properties, but probably stayed at the Property more often. ECF 109-2 at 51-52 (Tr. at 183-84). Likewise, it is not obvious that plaintiffs' testimony during the bankruptcy proceedings in the fall of 2016 is dispositive as to their living situation a year later.

As I see it, defendants go too far in simply dismissing Ms. Norris's testimony regarding her living situation as "self-serving." *See, e.g.*, ECF 152 at 12. "[C]ourts have 'long ago buried—

or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is self-serving.'" *Lovett*, 700 Fed. App'x at 212 (quoting *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)).  As the Fifth Circuit has commented, "[i]f all 'self-serving' testimony were excluded from trials, they would be short indeed."  *C.R. Pittman Constr. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 Fed. App'x 439, 443 (5th Cir. 2011).  To be sure, Ms. Norris's testimony was to her benefit.  But, it was testimony, under oath, based on her firsthand experience of her own living situation.  It is for a jury to determine credibility.  *See Anderson*, 477 U.S. at 249; *Kellen*, 2022 WL 2093849, at *1; *Wilson*, 893 F.3d at 218-19; *Guessous*, 828 F.3d at 216; *Jacobs*, 780 F.3d at 569; *Mercantile Peninsula Bank*, 499 F.3d at 352; *Black & Decker Corp.*, 436 F.3d at 442; *Dennis*, 290 F.3d at 644-45.

In sum, viewing the evidence in the light most favorable to plaintiffs, a factfinder could credit their account of events, in whole or in part.  Plaintiffs have established a genuine dispute of material fact as to whether, at the relevant time, the Property was vacant.  And, that issue is crucial to defendants' arguments that plaintiffs consented, via the Deed, to defendants' actions.

### 3.

The genuine dispute of material fact as to the question of vacancy precludes summary judgment in favor of defendants.  However, evening assuming that the Property was vacant, there are genuine disputes of fact as to whether defendants' actions were reasonable.

Paragraph 5 of the Deed authorizes "reasonable action to protect and preserve" the Property.  ECF 1-2 at 30.  It is undisputed that Mr. Twesigye performed preservation services, such as changing the locks and winterizing.  *See, e.g.*, ECF 109-4, ¶ 6.  In general, courts have found work of this sort to be reasonable when, as here, a deed authorizes action to secure or protect a property.  *See, e.g.*, *Galvin*, 852 F.3d at 163; *Hardie*, 544 F. Supp. 3d at 556-57; *Pruitt*, 2015 WL

9490234, at *10-11; *Vinal*, 131 F. Supp. 3d at 540; *Thompson*, 2014 WL 4269060, at *7; *McCray*, 2013 WL 1316341, at *5; *Bennett*, 2012 WL 1354546, at *10.

But, in the context of this case, a jury could find some of defendants' Property preservation work to have been unreasonable.  For example a jury could find that it was not reasonable to change the lock a second time after Ms. Norris had informed PNC that the Property was occupied and Safeguard had informed plaintiffs that preservation work on the Property would cease.  *Cf. Hebron v. American Isuzu Motors, Inc.*, 60 F.3d 1095, 1098 (4th Cir. 1995) ("[A] question of reasonableness is ordinarily one of fact.").

The more serious issue is the asserted theft, damage, and destruction of plaintiffs' personal property.  Defendants argue that there is no evidence that this occurred.  ECF 109-1 at 14-16; ECF 152 at 17-19; ECF 153 at 7-8.  But, plaintiffs argue otherwise.  In Ms. Norris's communications with the police, Safeguard, and PNC, she consistently claimed that defendants damaged, stole, or destroyed plaintiffs' property, including by mentioning specific details, such as the piggy bank. *See, e.g.*, ECF 1-2 at 92 (letter of November 26, 2017); ECF 79-3, calls 1, 13, 16 (calls with Safeguard); ECF 109-5 at 3 (police report); ECF 136-3 at 32 (PNC log).  And, beyond Ms. Norris's testimony regarding damages, plaintiffs have provided photographic evidence depicting, for example, the smashed remains of the piggy bank, and Safeguard photographs taken a day apart in which the piggy bank is no longer visible.  *See* ECF 137-7 at 1, 2; ECF 138 at 19-20.  And, if this conduct did occur, it could not be seen as reasonable, and defendants do not attempt to argue that it was.   Viewing the facts in the light most favorable to plaintiffs, it is not clear that summary judgment is appropriate for defendants on this question.

Mr. Twesigye vigorously denies any such conduct.  ECF 109-4, ¶ 10.  A reasonable jury could certainly find for defendants.  But, summary judgment is not appropriate.

In sum, genuine disputes of material fact preclude the Court from granting summary judgment to Safeguard and PNC on their core defense of plaintiffs' consent.  I turn next to defendants' arguments as to damages.

## E.  Damages

Safeguard argues that plaintiffs "cannot establish damages to support their claims," and that this is an additional reason as to why "Summary Judgment should be granted in Safeguard's favor."  ECF 109-1 at 16.  In addition, in its Reply, PNC contends that, in the context of the breach of contract claim, "Plaintiffs' lack of damages evidence . . . provides an independently sufficient basis for an award of summary judgment to PNC."  ECF 153 at 8.[33]

The trouble with defendants' arguments is that recovery of nominal, as opposed to actual, damages is possible for each of plaintiffs' three claims.  "[I]t is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001).  Likewise, "'[e]very unauthorized entry upon the land of another is a trespass, and whether the owner suffers substantial injury or not, [the owner] at least sustains a legal injury, which entitles [the owner] to a verdict for some damages; though they may, under some circumstances, be so small as to be merely nominal.'"  *Bittner v. Huth*, 162 Md. App. 745, 752, 876 A.2d 157, 161 (2005) (quoting *Tyler v. Cedar Island Club, Inc.*, 143 Md. 214, 219, 122 A. 38, 39 (1923)) (first alteration mine; remainder in *Bittner*).  Finally, intrusion upon seclusion is an intentional tort.  *See Bailer v. Erie Ins. Exchange*, 344 Md. 515, 525-27, 687 A.2d 1375, 1380-81 (1997) (citing RESTATEMENT (SECOND) OF TORTS § 652B).  And, "'a plaintiff who proves a prima facie case for an intentional

---

[33] As mentioned, "[t]he ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson*, 451 F. Supp. 2d at 734. In any case, this argument otherwise fails.

tort, but fails to prove damages, will always be allowed to obtain at least a nominal recovery.'" *Johnson v. Valu Food, Inc.*, 132 Md. App. 118, 126, 751 A.2d 19, 23 (2000) (quoting *Bugg v. Brown*, 251 Md. 99, 104, 246 A.2d 235 (1968)). Thus, defendants' asserted deficiencies as to plaintiffs' damages evidence do not provide a basis to grant summary judgment in favor of defendants.

However, it is well established that punitive damages "cannot be awarded in a pure breach of contract case." *Sims v. Ryland Group, Inc.*, 37 Md. App. 470, 475, 378 A.2d 1, 4 (1977); *see also Biktasheva v. Red Square Sports, Inc.*, 366 F. Supp. 2d 289, 295 (D. Md. 2005); *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 545, 515 A.2d 756, 765 (1986). Furthermore, "[t]he general rule is that emotional disturbance is not a damage recognized for breach of contract." *Richter v. North American Van Lines, Inc.*, 110 F. Supp. 2d 406, 413 (D. Md. 2000) (citing RESTATEMENT (SECOND) OF CONTRACTS, § 353); *see also Nyhart v. PNC Bank, N.A.*, PX-15-2241, 2016 WL 6996744, at *5 (D. Md. Nov. 30, 2016) ("Generally, damages for emotional distress . . . are not available in breach of contract cases."). Accordingly, I shall grant summary judgment to PNC as to any damages for emotional distress and punitive damages with regard to plaintiffs' breach of contract claim (Count I).[34]

I emphasize that I express no opinion as to whether any award of compensatory damages might ultimately be tenable. Indeed, plaintiffs' claimed damages appear to be vastly in excess of anything that might be justified by the record before the Court, even if a jury were to find liability on the part of the defendants. However, the law and the record do not support granting summary judgment to defendants on the basis of compensatory damages.

---

[34] As discussed, Safeguard is separately entitled to summary judgment as to Count I.

My conclusion is different as to punitive damages. Safeguard maintains that even if its summary judgment motion is denied, the Court should strike plaintiffs' request for punitive damages, because there is no evidence to establish that Safeguard acted with actual malice. ECF 109-1 at 16-17. PNC does not make a similar request.

In Maryland, "[w]ith respect to both intentional and non-intentional torts, . . . an award of punitive damages generally must be based upon actual malice . . . ." *Montgomery Ward v. Wilson*, 339 Md. 701, 733, 664 A.2d 916, 932 (1995). The term "actual malice" refers to "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill will or fraud . . . ." *Id.* at 729 n. 5, 664 A.2d at 930 n. 5; *see also Biktasheva*, 366 F. Supp. 2d at 296 ("Actual malice 'has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'") (internal citation omitted); *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 264, 841 A.2d 828, 837 (2004) ("Maryland courts have defined 'actual malice' as 'conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud.'") (internal citation omitted).

"What is needed to support an award of punitive damages is conscious and deliberate wrongdoing." *Hoffman v. Stamper*, 385 Md. 1, 42, 867 A.2d 276, 301 (2005). Thus, "[n]egligence or misjudgment, 'however gross,' does not satisfy the knowledge element." *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188, 193 (1998); *see also Darcars*, 378 Md. at 264, 841 A.2d at 837 (noting that "'negligence alone, no matter how gross, wanton, or outrageous, will not satisfy [the] standard [of actual malice]'") (internal citation omitted) (alteration in *Darcars*).

Furthermore, actual malice must be established by clear and convincing evidence. *Darcars*, 379 Md. at 264, 841 A.2d at 837; *see Le Marc's Mgmt. Corp. v. Valentin*, 349 Md. 645,

652, 709 A.2d 1222, 1226 (1998).  And, "[w]here an employee commits a tort within the scope of his employment and there is clear and convincing evidence supporting a finding that he acted with actual malice, that conduct may support an award of punitive damages against an employer premised on *respondeat superior*." *Fidelity First Home Mortgage Co. v. Williams*, 208 Md. App. 180, 214, 56 A.3d 501, 520-21 (2012); *see also Embrey*, 293 Md. at 134-40, 442 A.2d at 969-73.

Plaintiffs discuss the allegations against Safeguard contained in the documents from the Illinois and Maryland attorneys general, mentioned above.  *See* ECF 134 at 44.  But, as discussed, these documents merely contain allegations.  Beyond this, plaintiffs' discussion largely consists of simply citing a string of events and exhibits, accompanied only by a conclusory assertion that they document "malice and ill will."  *Id.* at 45-46.

The record provided to the Court, which has been discussed at length throughout this Memorandum Opinion, does not support a claim of actual malice, even when construed in the light most favorable to plaintiffs.  Instead, in the light most favorable to plaintiffs, the record largely reflects bureaucratic ineptitude or misjudgment.  Plaintiffs simply have not adduced sufficient evidence, to the degree required for punitive damages, to create a genuine dispute of material fact as to the existence of "conscious and deliberate wrongdoing," *Hoffman*, 385 Md. at 42, 867 A.2d at 301, or "evil and wrongful motive," *Montgomery Ward*, 399 Md. at 733, 664 A.2d at 932, as opposed to "[n]egligence or misjudgment." *VF Corp.*, 350 Md. at 704, 715 A.2d at 193.

In sum, the record falls far short of reflecting any genuine dispute of material fact as to actual malice.  I will grant summary judgment to Safeguard as to punitive damages.[35]

---

[35] Because PNC did not raise this issue in its motion, I do not award summary judgment to PNC as to punitive damages. However, it is clear that, based on the current record, the conclusion would be the same as to PNC.

## V.     Sealing

Plaintiffs have moved to seal their Opposition (ECF 134), along with all exhibits filed in support of the Opposition.  ECF 135; ECF 136; ECF 137; ECF 138; ECF 141; ECF 145.  Their motion to seal is docketed at ECF 139.  The sole ground cited in the motion to seal is that "some of the exhibits" have been designated as confidential by defendants during the discovery process. *Id*.  Plaintiffs also make clear in the motion that they disagree with these designations, and with defendants being permitted to place documents under seal on this basis.  *Id*.  Simply because information was designated as confidential under a protective order does not automatically mean the Court must seal such information.  *See Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252-54 (4th Cir. 1988); *In re Marriott*, PWG-19-2879, 2019 WL 4855202, at *2 (D. Md. Aug. 30, 2019).  Plaintiffs do not cite any other grounds for sealing, nor do they assert that any documents warrant sealing, aside from those designated as confidential by defendants.  *See* ECF 139.

Plaintiffs have also moved to seal (ECF 131) their original, superseded opposition.  *See* ECF 130.  This motion to seal cites the same grounds.  *See* ECF 131.  However, no exhibits accompany ECF 130.  In the meantime, ECF 130 and ECF 134, and the exhibits to ECF 134, have been temporarily filed under seal.  Defendants have not responded to plaintiffs' motions to seal.

In ruling on a motion to seal, the court must: (1) give the public notice that the sealing of documents may be ordered; (2) provide interested parties the opportunity to object to the motion; (3) state reasons on the record if the court decides to seal the case; and (4) state reasons for rejecting alternatives.  *Rushford*, 846 F.2d at 253-54.  When motions have been docketed and available to the public for multiple weeks, as here, the first two requirements have been met.  *Padco Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 614 (D. Md. 2002).  "[T]he court should consider less drastic

alternatives to sealing, such as filing redacted versions of the documents." *Rock v. McHugh*, 819 F. Supp. 2d 456, 475 (D. Md. 2011).

The common law presumes that the public and the press have a qualified right to inspect all judicial records and documents. *Doe v. Pub. Citizen*, 749 F.3d 246, 265 (4th Cir. 2014) (citations omitted); *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004), *cert. denied*, 544 U.S. 949 (2005); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17 (1980) ("[H]istorically both civil and criminal trials have been presumptively open."). The common law right of access can be abrogated in "unusual circumstances," where "countervailing interests heavily outweigh the public interests in access." *Rushford*, 846 F.2d at 253; *accord Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 121 (D. Md. 2009).

The common law right of access is buttressed by a "more rigorous" right of access provided by the First Amendment, which applies to a more narrow class of documents, but is more demanding of public disclosure. *Rushford*, 846 F.2d at 253. If a court record is subject to the First Amendment right of public access, the record may be sealed "only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988) (citing *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984)). "When presented with a sealing request, our right-of-access jurisprudence requires that a district court first 'determine the source of the right of access with respect to each document, because only then can it accurately weigh the competing interests at stake.'" *Doe*, 749 F.3d at 266 (4th Cir. 2014) (quoting *Stone*, 855 F.2d at 181).

In the Fourth Circuit, it is well established that "the more rigorous First Amendment standard should also apply to documents filed in connection with a summary judgment motion in a civil case." *Rushford*, 846 F.2d at 252-53. Here, plaintiffs seek the sealing of both their past and

operative summary judgment opposition briefs, as well as the supporting exhibits.  Thus, plaintiffs'
proposed sealing must be based on a compelling governmental interest, and narrowly tailored to
serve that interest.

Sealing the Opposition and all the exhibits would plainly be overbroad.  Nor have plaintiffs
indicated in their motion to seal which specific exhibits have been designated by defendants as
confidential.  However, reviewing the exhibits, the Court has identified certain exhibits that are
composed of documents that have been designated by defendants as confidential, and that
constitute proprietary commercial documents, such as contracts and internal records.  These are
appropriate for sealing.  They are ECF 135 (not including ECF 135-1 to ECF 135-10); ECF 136-
2; ECF 136-3; ECF 136-5; and ECF 145.  *See, e.g.*, *Pittston Co. v. United States*, 368 F.3d 385,
406 (4th Cir. 2004) (affirming sealing of "confidential, proprietary, commercial, or financial data"
disclosed pursuant to a protective order).  The Court does not discern a basis for sealing either
version of the Opposition, nor any other exhibits, save as discussed below.  Accordingly, ECF 139
will be granted in part and denied in part, and ECF 131 will be denied.

As noted, plaintiffs do not invoke any other grounds for sealing, nor make any argument
that any of their own documents, containing their own information, ought to be sealed.  The Court
takes them at their word.  Nevertheless, the Court notes that one exhibit, ECF 137-16, is composed
of close-up pictures of a medical condition of Ms. Norris, along with the Affidavit of plaintiffs'
therapist, Albert Phillips, which includes considerable information as to plaintiffs' mental health.
Plaintiffs also appear to have marked various pages of this exhibit as confidential.  "[S]ensitive
medical or personal identification information may be sealed."  *Rock*, 819 F. Supp. 2d at 475.
Given the sensitive, personal nature of this documentation, and plaintiffs' pro se status and their
continuing misunderstandings regarding the sealing process, I will seal ECF 137-16 as well.

If any party believes that any document warrants a sealing treatment that differs from what I have said, the party may move for reconsideration within 21 days of the docketing of this Memorandum Opinion and accompanying Order, to include the grounds in support of the request.

## VI.    Conclusion

For the reasons stated above, I shall grant the summary judgment motions in part and deny them in part.  I shall grant summary judgment to Safeguard as to plaintiffs' breach of contract claim (Count I), and as to punitive damages.  I shall otherwise deny the Safeguard Motion.

I shall grant summary judgment to PNC as to any claim of vicarious liability for the alleged intentional theft, damage, and destruction of plaintiffs' personal property by Mr. Twesigye, but not including any alleged property damage that resulted specifically from Mr. Twesigye's actions to winterize and secure the Property.  And, I shall grant summary judgment to PNC as to any damages for emotional distress and punitive damages as to plaintiffs' breach of contract claim.  I shall otherwise deny the PNC Motion.

An Order follows, consistent with this Memorandum Opinion.


Date: June 16, 2022                                    _____/s/_____
                                                       Ellen L.  Hollander
                                                       United States District Judge